Filed 3/13/14  Site Management Services v. Cingular Wireless CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SITE MANAGEMENT SERVICES, INC. et al., | D057106 |
| Plaintiffs, Cross-complainants, Cross-defendants and Appellants, | (Super. Ct. No. GIC852215) |
| v. | |
| CINGULAR WIRELESS LLC et al., | |
| Defendants, Cross-complainants, Cross-defendants and Appellants. | |

APPEALS from a judgment and appeal from a postjudgment order of the Superior Court of San Diego County, Kevin A. Enright, Michael M. Anello, Joan M. Lewis, Frederic L. Link, Judges.  Judgment on jury verdict reversed with directions; prejudgment orders affirmed; postjudgment order reversed and vacated.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller, Kenneth D. Watnick and David E. Reynolds for Plaintiffs, Cross-complainants, Cross-defendants and Appellants Site Management Services, Inc., Site Management Solutions, Inc., and Michael P. Flynn.

Proskauer Rose LLP, Michael H. Weiss, Bradley I. Ruskin and Kevin J. Perra for Cross-Complainant, Cross-defendant and Appellant TMO CA/NV, LLC.

McKenna Long & Aldridge LLP, Robert A. Cocchia and Gary K. Brucker, Jr. and David L. Balser; Reed Smith LLP and Margaret Anne Grignon for Defendants, Respondents and Cross-appellants Cingular Wireless, LLC, GSM Facilities, LLC, CA/NV Tower Holdings, LLC, SBC Wireless, LLC, and SBC Communications, Inc.

INTRODUCTION

This action involves multiple claims and cross-claims alleging breach of contract and fraud, among other wrongs, by and against plaintiff Michael Flynn (Flynn), two companies partly or wholly owned and controlled by Flynn, plaintiffs Site Management Services, Inc. (Services) and Site Management Solutions, Inc. (Solutions), and defendants Cingular Wireless, LLC (Cingular) and TMO CA/NV, LLC (TMO), successor companies to Pacific Bell Wireless LLC (Pacbell) (collectively, defendants). In 1999, Solutions and Pacbell entered into three agreements under which Solutions would provide wireless telecommunications site acquisition and management services for Pacbell. Flynn, then an employee of Pacbell, signed all three agreements on behalf of his employer.

Defendants contend that when Flynn signed the agreements, he had an undisclosed financial and ownership interest in Solutions, a company he allegedly started with an old friend, Charles O'Neal (O'Neal) and personally sought to profit from that venture in violation of his fiduciary duties to Pacbell. Flynn eventually left Pacbell and took over Solutions and started another company, Services, which acquired certain rights under the agreements from Solutions. After Flynn, Solutions, and Services sued Pacbell and its

2

successors for breach of two of the agreements, defendants filed cross-complaints for fraud and breach of fiduciary duty, among other causes of action. Defendants claimed the agreements were voidable for fraud in the inducement, and affirmatively sought to rescind the agreements and recover damages.

The parties, on their respective appeals, ask us to review numerous asserted errors by three different trial court judges who presided over various stages of this litigation. Among other contentions, plaintiffs contend that the trial court erred in granting defendants' motions for summary judgment on plaintiffs' operative fourth amended complaint on the ground the subject agreements were unenforceable because they were fraudulently induced. TMO contends, among other things, that the judgment after jury verdict must be reversed for insufficiency of the evidence to support the jury's findings on the issues of ratification and waiver of fraud, and for prejudicial error in jury instructions on waiver and ratification. TMO also contends the court erred in ordering that certain interpleaded funds be returned to Solutions. Cingular contends the trial court erred in failing to designate it and related entities in the judgment as prevailing parties entitled to costs.

We reverse the judgment on the jury verdict, affirm the order granting defendants' motion for summary judgment on the fourth amended complaint, and vacate the order

3

regarding the interpleaded funds.  We review various other assignments of error as discussed below.[1]

## FACTUAL BACKGROUND[2]

### I.

### *Flynn's Alleged Conflict of Interest Regarding the Agreements at Issue*

During the mid-to-late 1990's, defendant Pacific Bell Mobile Services (PBMS), doing business as Pacbell, was in the process of setting up the infrastructure, or network, required to provide its customers in the greater Los Angeles region with cellular phone service.  Pacbell had been using a consultant (SBA) for the location, acquisition and development of network sites, but sought to pay lower fees.  In late 1998, after SBA declined to lower its prices, Pacbell issued a Request for Proposal (RFP) to find a replacement.

At that time, Flynn was Director of Network Deployment at PBMS for the Costa Mesa/Los Angeles market.  His responsibilities included finding, leasing and developing network sites.  Sensing a lucrative business opportunity, Flynn asked his supervisor at

---

[1]     The only final judgment entered in this case is the judgment on the jury verdict. The orders and rulings preceding that judgment that we address in this opinion are reviewable on appeal from that final judgment.  (*County of San Diego v. Arzaga* (2007) 152 Cal.App.4th 1336, 1343-1344.)  We view the minute order directing return of interpleaded monies to Solutions as an appealable postjudgment order under Code of Civil Procedure section 904.1, subdivision (a)(2).  The minute order was entered on the same day as the judgment (March 12, 2010) and states that counsel were provided a conformed copy of the judgment along with the order for return of the interpleaded funds.

[2]     We summarize here the evidence before the court during the 2007 summary judgment proceedings, which are the subject of the first portion of our opinion.  We will discuss evidence presented at the 2009 trial later in the opinion, as needed.

4

Pacbell if he could participate in the RFP, i.e., submit a bid as a vendor, independent from Pacbell. His supervisor, Charles Vranek (Vranek), informed him he would not be able to do so.

Flynn devised another way by which he could profit from this opportunity. He contacted O'Neal, an old school friend, about bidding on the Pacbell site acquisition contract, even though O'Neal had no experience in the wireless industry. According to his deposition testimony in this case, Flynn's intention was to help O'Neal set up a site acquisition business to make a bid under the RFP and then, when Flynn left Pacbell, he (Flynn) would "receive ownership" of the new venture. During their initial negotiations in 1998, Flynn and O'Neal discussed forming a company in which Flynn would receive a 70 percent ownership stake. Flynn intended from the beginning to "actually have the ownership of the company" once he left Pacbell, because he was "the one who knows the industry." He believed that if he left Pacbell he "would come over, take over running the company, and be the owner."

In accordance with their plan, O'Neal formed O'Neal & Associates to bid on the RFP. Flynn helped O'Neal by giving him advice on how to "model" his RFP proposal as a "temp agency," using experienced SBA employees to hold down costs. Flynn provided no such assistance to any other bidders. O'Neal was awarded the site acquisition contract in October 1998. In deposition testimony, Flynn admitted that O'Neal obtained a business relationship with Pacbell in part because of Flynn's efforts.

In December 1998, O'Neal incorporated O'Neal Communications Group, Inc. (OCG) which later became The Consulting Group (TCG). OCG assumed the consulting

5

contract Pacbell had awarded O'Neal & Associates under the RFP. In 1999, Pacbell entered into three other agreements with a different company formed by O'Neal ─ plaintiff Solutions. These agreements are at the center of the parties' disputes in this litigation.

On February 25, 1999, Solutions and Pacbell entered into a contract whereby Solutions would act as sublicensor with respect to cellular transmission equipment used by Pacbell on property licensed from Caltrans in Southern California, for which Solutions would receive a sublicense fee (the Caltrans Agreement). In May 1999, Solutions and Pacbell entered into the Sublicense Agreement (SLA), which was similar to the Caltrans Agreement in that Solutions would act as a contractual intermediary between Pacbell and municipalities and public agencies other than Caltrans, and would charge a sublicensing fee. In July 1999, Solutions and Pacbell entered into the Site Management Agreement (SMA), which retroactively commenced in December 1998. The SMA made Solutions the exclusive manager of Pacbell's "colocations" in the Los Angeles region, whereby Pacbell subleased or sublicensed space on its cellular sites to other carriers. Under the SMA, Solutions was given authority to collect all colocation rents for that region and retain 25 percent of the rents for its fee. The SMA also provided that Solutions would share in any cost savings resulting from n agreements. On all three agreements, O'Neal signed for Solutions, and Flynn signed for Pacbell.

Solutions was incorporated just two days before the Caltrans Agreement was executed specifically for the purpose of giving Pacbell a means of subleasing space on Caltrans rights-of-way. O'Neal testified that Solutions had no employees of its own;

6

rather, it utilized OCG employees, and the companies had the same address. Pacbell was Solutions's only client. O'Neal testified that Solutions did not enter into contracts with any other wireless carriers.

Flynn testified in deposition that he believed he had a "gentleman's agreement" with O'Neal from the time of their initial discussions in August 1998 that once he left Pacbell he would come over to OCG and eventually run and own that company. Flynn came to believe, however, that O'Neal would not honor that agreement, testifying, "There [were] times when I felt that I wasn't sure if I did move over, that one, he even wanted me to move over; and then, two, whether he would, you know, give me ownership in it." Ultimately, Flynn told O'Neal that he would go into a competing business on his own if O'Neal did not "strike a deal" with him. Flynn and O'Neal thereafter reached an agreement, and on September 21, 1999, they executed an Agreement of Understanding (AOU) memorializing the evenly-shared ownership structure of both OCG and Solutions. The AOU provided: "Michael Flynn has received a 50% ownership position in [OCG], equal to 1250 shares of the outstanding shares," and "has received a 50% ownership position in [Solutions] equal to 1250 shares of the current outstanding shares."

Notwithstanding the language of the AOU indicating that Flynn already was an owner of both OCG and Solutions, Flynn testified at his deposition that he did not have an ownership interest Solutions from the time the company was formed. Rather, he claimed that O'Neal started that company at the behest of Pacbell, and he (Flynn) did not acquire ownership until he discussed the AOU with O'Neal later in 1999. Flynn did not dispute, however, that he never disclosed his financial interest in OCG and Solutions to

7

Pacbell.  Although Pacbell management apparently knew about Flynn's friendship with O'Neal, Flynn admitted that before he left Pacbell he never told anyone there about his "gentleman's agreement" with O'Neal, his ownership interest in OCG and Solutions, or the AOU.  Before leaving Pacbell, Flynn received compensation worth at least $2.7 million (including a residence) and a $160,000 "signing bonus," attributable to his ownership interest in OCG and Solutions.  Additionally, in late December 1999, Solutions issued 2,500 shares of stock to Flynn and entered into a stock purchase agreement with him.

## II.

### *Pacbell's Initial Investigation of Flynn*

Kelly King became Pacbell's Vice President of Network Operations in early 1999 and became aware that there was a personal relationship between Flynn and O'Neal.  In August 1999, King began receiving anonymous e-mails that used the name of a Pacbell employee without that person's permission.  The e-mails accused Flynn of defrauding Pacbell in his dealings with O'Neal and claimed Flynn was "a pathological liar" and had set up his friend O'Neal in the telecom industry for Flynn's personal profit, even though O'Neal had no prior experience in that area.  The e-mails also asserted that the exclusive deals with O'Neal's companies were harming Pacbell's competitiveness.  One e-mail asked, "When are you guys going to catch on[?]"  The e-mail further stated, "Every other [office] knows about Flynn/O'Neal fraud — it is about time you guys did too."

King asked Pacbell security "to conduct a complete investigation of the matter."  A report on this investigation was issued in November 1999.  The report concluded that

8

the RFP process for finding a replacement site acquisition company was "followed and verified by procurement;" that Flynn and O'Neal told Pacbell of their relationship; that "Flynn denies giving O'Neal inside competitive bid information so OCG would be awarded the [Caltrans] contract;" that "Flynn denies receiving any compensation from O'Neal, for the award of the contract;" and that "O'Neal denies receiving or giving compensation to anyone for the award of the contract." Pacbell security did not ask more specific questions during the investigation about the SMA and SLA, or about Flynn's relationship with Solutions at the time he executed those agreements. In a written statement requested by security, King stated that he never witnessed anything other than professional behavior by Flynn and O'Neal in their business dealings.

III.

*Flynn Leaves Pacbell and Acquires Solutions*

On December 20, 1999, Flynn informed King he intended to resign from Pacbell, effective February 4, 2000. Flynn testified he decided to stay on at Pacbell until the investigation was concluded, and then continued to work through the end of 1999 at King's request to "wrap[] up the loose ends" on a particular project. In April 2000, shortly after officially beginning his new job at OCG and Solutions, Flynn, but not O'Neal, attended a meeting with Pacbell representatives. At that meeting, William Cumbie, a Pacbell vice-president, asked Flynn "about the whereabouts of O'Neal." Flynn told Cumbie that O'Neal had left OCG for personal reasons and that he (Flynn) would thereafter be responsible for meeting the "deliverables" under the contract. Cumbie was concerned about O'Neal's absence and Flynn's unexpected claim of being in charge at that

9

point. Notwithstanding Cumbie's concerns, Pacbell continued to do business under its agreements with OCG and Solutions.

In October 2000, SBC Communications, Inc. (SBC), Pacbell's parent company, contributed Pacbell and other assets to a new joint venture with BellSouth Corporation, which became defendant Cingular. The next month, Flynn met with Cingular and SBC representatives to discuss their concerns about whether the SMA would interfere with SBC's tower lease and management agreement with another company called SpectraSite. According to a letter from Flynn to SBC, at those meetings Flynn learned for the first time that [Pacbell] desired to terminate the entire agreement. As reflected in Flynn's letter, Pacbell was concerned that Flynn "exceeded [his] authority in executing the agreement on behalf of [Pacbell] while [he] was employed at [Pacbell] and that, as a result, [Pacbell] believed the contract was potentially invalid." Flynn testified that he was accused of having a "conflict of interest" and "violat[ing] his signing authority . . . in an attempt to get these agreements in place." In a letter, William R. Schlecht, senior counsel of SBC, explained that as a "property manager" at the time the SMA was executed, Flynn did not have the authority to obligate Pacbell under that agreement, and it appeared no other Pacbell employee had approved the agreement. Schlecht further observed that after executing the SMA, Flynn left Pacbell "and became president of [Solutions], the other party to the [SMA]." After the meetings, SBC wrote to SpectraSite, stating that SBC and Pacbell "question the validity of the [SMA] and intend to challenge any obligations purportedly incurred thereunder."

10

The parties have not identified any evidence in the summary judgment record showing how, if at all, SBC/Pacbell resolved what it perceived to be Flynn's alleged misuse of his signing authority. However, Cumbie testified he did not recall specific discussions about Flynn's relationship with OCG/TCG or Solutions after the November meeting. Another person who was present at the November 2000 meetings testified that, notwithstanding the concerns raised by Schlecht, Cingular/Pacbell "continued performing" under the SMA. According to Services, over the course of the next year, Cingular/Pacbell entered into numerous colocation agreements subject to the SMA.

IV.

*Flynn Forms Services and Is Investigated*

In September 2000, Flynn formed Services. In August 2001, Solutions assigned to Services "all of [Solutions's] duties, obligations of performance, and benefits of the [SLA], except as to the City of Riverside." Cingular/Pacbell consented to the assignment. In July 2002, as part of a comprehensive settlement of various disputes between Flynn and O'Neal (the 2002 Flynn/O'Neal Settlement), Solutions agreed to transfer certain assets to Services. The settlement, which was made effective as of December 31, 2001 allocated Solutions's business activities between "Retained Activities" and "Discontinued Activities." The parties agreed that the Retained Activities would remain an asset of Solutions. The Discontinued Activities, which included future business under the SMA, would be assigned to Services. Based on these assignments, Services alleged that it had the right to assert all the claims it ultimately alleged in this action.

11

In early 2002, SBC received an anonymous letter suggesting that contracts had been awarded to OCG and TCG ─ which Flynn had taken over after O'Neal left ─ "without competitive bidding."  An investigation ensued and concluded that "a competitive bid RFP process was followed" with respect to the TCG contract.  The investigation report noted the 1999 investigation previously had "indicated [Flynn] followed the RFP process."

V.

*Flynn's 2002 and 2003 Testimony In Unrelated Litigation*

In 2002 and 2003, Flynn and O'Neal were engaged in litigation concerning their ownership and control of OCG and TCG.  During those proceedings (to which none of the defendants in this case were parties), Flynn gave incriminating testimony that, according to defendants in this case, showed he had at least a conditional, if not actual ownership, interest in both OCG *and* Solutions at the time he executed the subject agreements on behalf of Pacbell but, in violation of his fiduciary duties, did not disclose that interest to Pacbell.

During a 2002 arbitration proceeding to resolve a dispute over their respective ownership shares of OCG, Flynn testified that he had wanted to participate in Pacbell's 1998 RFP process because he knew he "could bring value to the Los Angeles market" and "at the same time [he] would have the opportunity to make the money that a lot of other vendors were making."  He therefore devised a plan to "make that happen" ─ i.e., helping his friend O'Neal win the Pacbell contract.  But from the outset, it was Flynn's intention and understanding that he would ultimately own and control the business he

12

would set up with O'Neal. He testified: "I wanted control of the company that I perceived. I wanted to do the things that I thought I could do as an independent contractor and compete with, you know, companies that I had worked with prior." Flynn admitted that he provided extensive "expertise to [O'Neal] on how to respond [to the RFP]," including on the "key elements when it comes to staffing, when it comes to pricing, when it comes to what I perceived as the right profit margin compared to what I knew the margins were of the existing vendors."

Flynn further acknowledged during the 2002 arbitration that after the formation of OCG, "I was wearing two hats. I was the client and I was the customer." While continuing to work at Pacbell, Flynn spent "a couple days a week" at OCG, working with O'Neal to "make strategic decisions together, staffing, hiring, you know, setting up the colocation department," and also "worked on agreements [for] Solutions to memorialize and to put in place contractual relationships." Although he was "getting a little antsy . . . to leave [Pacbell] so that [he] could devote . . . a hundred percent of [his] time to" the new business venture, Flynn stayed on at Pacbell through 1999 because he and Flynn recognized that doing so would enable him to "better [his and O'Neal's] interest" and "entrench" the relationship between Pacbell and the new ventures. However, Flynn "started feeling that there was potential that the deal [with O'Neal regarding ownership of the new company] was being forgotten."

For that reason, Flynn drafted the AOU to memorialize his shared ownership of OCG and Solutions. He testified in 2002 that the recitation in the AOU that he "has received" 50 percent ownership position in both OCG and Solutions was consistent with

13

his understanding after the initial 1998 negotiations with O'Neal ─ i.e., that he (Flynn) "was an owner the whole time."  When asked about the 1999 investigation instigated by King, Flynn acknowledged at the 2002 arbitration that he was "cleared" of having a conflict of interest because he did not tell Pacbell about his ownership interest in OCG. He testified that he and O'Neal "kept our relationship and the business confidential."

Flynn described the hiatus between his departure from Pacbell in early 2000 and his official start at OCG and Solutions in April 2000 as a "cooling off" period.  Flynn discussed business with O'Neal during this period, but saw it as "a time for [him] to lay low."  Shortly after Flynn began his new job, O'Neal left the companies and Flynn assumed complete control.  Although Flynn told others that O'Neal's departure was for personal reasons, Flynn testified in 2002 that this was a pretext:  "That was a reason that we gave to try to soften the impact of Cingular seeing the transition of the company from O'Neal to myself."  In fact, Flynn acknowledged he "had taken over the daily operations of the company."

During a subsequent lawsuit between Flynn and O'Neal entitled *The Consulting Group, Inc. v. Charles D. O'Neal*, No. 02CC15070 (Orange Co. Super. Ct.) (*TCG v. O'Neal*), Flynn testified in 2003 that he had concealed his conflict of interest in OCG from Pacbell.  Under questioning from O'Neal's attorney, Flynn challenged O'Neal's assertion that he (O'Neal) had started Solutions, stating:  "That . . .  argument would put him in perjury . . . .So how we started the company is an issue that O'Neal and I have – it's very delicate . . . .

14

## VI.

### *The TCG v. Cingular Action*

In a federal action commenced in 2003 and entitled *The Consulting Group, Inc. v. Cingular Wireless, LLC*., No. SACV 03-109 DOC (MLGx) (U.S. Dist. Ct., C.D. Ca.) (*TCG v. Cingular*), TCG sued Cingular based on its alleged failure to pay TCG's invoices under a site acquisition agreement the parties entered into in June 2001; the same agreement, apparently, that had been a subject of the anonymous e-mails leading to the 2002 investigation of Flynn. In a counterclaim it filed in that action, Cingular alleged that TCG committed fraud and fraud in the inducement with respect to the 2001 agreement by, among other things, charging Cingular inflated prices on its invoices, submitting duplicate invoices, and charging for unauthorized services.

In November 2004, Cingular and TCG reached a settlement. Although he was not a party to the action, Flynn was expressly made a party to the settlement agreement, which provided, in part, that in exchange for consideration Cingular would "fully and forever release and discharge Flynn and TCG . . . from any and all claims . . . that have been made or could have been made at anytime" before the settlement. For their part, Flynn and TCG released Cingular "and its . . . employees, . . . representatives, attorneys, parent companies, subsidiaries, divisions, assigns, predecessors, and successors" from "any and all claims . . . that have been made or could have been made" before the settlement.

15

PROCEDURAL HISTORY

I.

*Services's Operative Fourth Amended Complaint*

This litigation began in August 2005, when Solutions, Services, TCG and Flynn (as both an individual and in his capacity as a Solutions shareholder) filed their initial complaint against Cingular, alleging, among other causes of action, breach of contract, intentional interference with contractual relations, fraudulent concealment and defamation. After the court sustained a series of demurrers, Solutions, Services and Flynn (in his capacity as a Solutions shareholder) remained as plaintiffs.[3] TCG and Flynn (in his individual capacity) were dismissed as parties by stipulation. Services filed a fourth amended complaint in November 2006.[4]

The defendants named in the fourth amended complaint were Cingular; Pacbell; PBMS; GSM Facilities, LLC; CA/NV Tower Holdings, LLC; SBC Wireless, LLC; and

---

[3]     These demurrer rulings are not part of this appeal.

[4]     Although the fourth amended complaint named Services, Solutions, and Flynn as plaintiffs,, only Services asserted causes of action against the defendants in that complaint.

16

SBC Tower Holdings, LLC.[5]  In the first cause of action, Services charged defendants with breaching the SMA as to Solutions's rights thereunder, which allegedly were assigned to Services pursuant to the 2002 Flynn/O'Neal Settlement.  Specifically, Services alleged that defendants failed to pay rent, management, and cost sharing fees owed to Services under the colocation terms of the SMA, particularly those generated by the GSMF Joint Venture.  The second cause of action alleged that all defendants breached the SLA by, among other things, negotiating directly with third parties for right-of-way licenses and by failing to pay sublicensor fees to Services as Solutions's assignee. The third cause of action alleged that Cingular violated California's Cartwright Act (Bus. & Prof. Code, § 16700 et seq.) by secretly agreeing with other carriers to refrain from doing business with Solutions, Services, or any company affiliated with Flynn, thereby hindering competition in the development of wireless facilities and creating higher costs for cell phone users in the Southern California region.

---

[5]  GSM Facilities, LLC, was a joint venture in existence from November 2001 to January 2005 between Cingular and Voicestream Wireless (later, T-Mobile), whereby those companies would share their existing network infrastructures in California/Nevada (SBC/Pacbell's infrastructure) and the New York City Metropolitan area (Voicestream's Omnipoint Facilities Network 2 infrastructure) (hereinafter, the GSMF Joint Venture). Services alleged that CA/NV Tower Holdings, LLC, along with SBC Wireless, LLC (SBC Wireless) and SBC Tower Holdings, LLC (SBC Holdings), were "assigned, without notice to Plaintiffs, ownership interest and control over sites in the Los Angeles region, including any liabilities relating to those sites."

*Defendants' Cross-Complaints*

In December 2006, TMO[6] filed a cross-complaint, asserting five causes of action against Solutions and Services for breach of contract and fraud and seeking an accounting and declaratory relief. TMO's cross-complaint alleged Services was not entitled to enforce the SMA and SLA because of Flynn's breach of loyalty, conflicts of interest, and self-dealing in that he "had been promised an ownership interest in Solutions" while still employed at Pacbell and caused Pacbell to enter into "one-sided, exclusive 'services' contracts for the purpose of enriching Solutions at the expense of [Pacbell]." TMO alleged, however, that if it was determined Services could enforce TMO's obligations under those agreements, then Solutions and Services were liable for breaching their obligations under the agreements. Specifically, TMO alleged that Services and Solutions repeatedly failed to pay TMO its share of the rents collected by Solutions on colocation agreements, and instead "offset" against the amounts payable to TMO those rents Services claimed were improperly paid directly to TMO and the management fees Services alleged it was entitled to under the SMA. In June 2007, TMO filed its first amended cross-complaint, adding Flynn and TCG as cross-defendants, as well as claims seeking damages for fraud, declaratory relief, and rescission of the SLA and SMA based

---

6     In January 2005, SBC/Cingular sold various assets to T-Mobile, including the SMA and SLA and Cingular's subsidiary, Pacbell. T-Mobile then changed Pacbell's name to TMO CA/NV LLC, or TMO.

on Flynn's alleged fraudulent execution of those agreements on Pacbell's behalf while also possessing an undisclosed ownership interest in Solutions.

In December 2006, Cingular filed its own cross-complaint against Solutions and Services for breach of contract, tortious interference with contract, and declaratory relief. Cingular alleged that Solutions, in violation of the SMA, failed to provide notice of assignment of its rights to Services under that agreement and that Cingular never consented to any such assignment. Cingular alleged it was damaged by Services's wrongful attempts to enforce the SMA. Cingular also alleged that PacBell properly served Solutions with notice of nonrenewal of the SMA in August 2003, and that Services's attempts to enforce obligations under the SMA after December 1, 2003 were therefore improper and constituted tortious interference with Cingular's agreement with Solutions. In March 2007, Cingular filed a first amended cross-complaint, which added a fourth cause of action for fraud seeking damages and rescission of the SLA and SMA based on Flynn's alleged concealment of his ownership interest in Solutions.

III.

*Plaintiffs' Cross-Complaints*

In June 2007, Services filed a cross-complaint against the original defendants, plus SBC and affiliates, for fraud, breach of contract, and contractual indemnity. The first cause of action for fraud was based on Services's allegations that Pacbell and SBC represented that it had assigned its interests in the sites subject to the SMA to Southern Towers, Inc., and that SpectraSite, the purported parent of Southern Towers, Inc., had purchased all of Pacbell's and SBC Holdings's interests in the listed sites, thereby

19

invoking the "escape" clause of the SMA. These representations were allegedly false because the purported assignment was in fact a lease that deprived Services of management fees and colocation opportunities to which it was entitled under the SMA. In the breach of contract claim, Services alleged that Cingular's cross-complaint against it improperly asserted causes of action that Cingular released as part of its settlement with TCG in the *TCG v. Cingular* litigation, which explicitly had preserved the rights of Services and Solutions. Services alleged that it was a "third-party beneficiary" of that settlement, and thus was entitled to enforce the release of any claims that Cingular and/or Pacbell may have had against Services.

In August 2007 Solutions filed its own cross-complaint against TMO, alleging causes of action for breach the Caltrans Agreement and SMA, an accounting, and goods and services rendered, based on TMO's alleged failure to pay all the fees due to Solutions for services rendered. Finally, Flynn, in his individual capacity, filed a cross-complaint against Cingular in November 2007, asserting a single cause of action for "breach of settlement agreement." Flynn's cross-complaint was directed at TMO's cross-complaint against him, alleging that any claims TMO had against Flynn were released in the *TCG v. Cingular* settlement agreement.

*The Parties 2007 Motions for Summary Judgment*
*And Summary Adjudication*

A.      *Defendants' motions addressed to the fourth amended complaint*

In March 2007 TMO, as successor to Pacbell, filed its motion for summary judgment, or alternatively, for summary adjudication, of the first and second causes of action for breach of the SMA and SLA, respectively, as alleged against TMO in the fourth amended complaint.  TMO asserted that the 2002 and 2003 transcripts from the proceedings between Flynn and O'Neal, which TMO claimed it had received only through discovery in this case, revealed Flynn's self-dealing and conflicts of interest that rendered the SMA and SLA voidable and unenforceable.  Cingular joined in TMO's motion.

Cingular and related entities[7] filed their own motion for summary judgment or, alternatively, summary adjudication, as to all causes of action in the fourth amended complaint.  Cingular challenged Services's first cause of action on the ground the GSMF Joint Venture was not covered by the SMA because it was not a colocation agreement within the meaning of the SMA – i.e., it did not involve the physical placement of a third party's equipment on Pacbell/Cingular's wireless sites.  Additionally, Cingular argued that Services's claim under the SLA was barred by prelitigation settlement payments Cingular

---

[7]      The moving parties were Cingular; SBC Tower Holdings, LLC; CA/NV Tower Holdings, LLC; GSM Facilities, LLC; and New Cingular Wireless PCS, LLC as successor by merger to SBC Wireless.  We will refer to them collectively in this section as Cingular.

already had made to Services for fees allegedly owed under the SLA. Finally, Cingular asserted that Services had failed to produce any evidence supporting its Cartwright Act claim. TMO joined in Cingular's motion.

In response to TMO's motion, Services disputed that Flynn had been an owner of Solutions at the time the SLA and SMA were executed, but also argued that even if that were the case, defendants had ratified the agreements with knowledge of Flynn's alleged conflict of interest, and thus waived any fraud defense. Services responded to Cingular's motion directed at Services' first breach of contract claim by arguing, first, that Cingular improperly sought piecemeal adjudication of that claim in focusing their arguments on particular transactions rather than challenging the claim as a whole. Second, Services argued the GSMF Joint Venture was a colocation agreement entitling Services to a share of the cost savings obtained. Third, Services argued that its acceptance of Cingular's payment under the SLA was not an accord and satisfaction so as to bar Services's claim for unpaid fees. Finally, Services contended that substantial evidence supported its Cartwright Act claim.

B.  *Defendants' motions for summary adjudication on their cross-claims*
    *for declaratory relief*

Contemporaneously with its motion addressed to Services's claims, Cingular filed a motion for summary adjudication of its own cause of action for declaratory relief, seeking a judicial declaration that Services lacked standing to sue under the SMA and, further, could not seek damages under that agreement for any period after Cingular gave notice of its nonrenewal. Cingular argued that Services was neither a signatory to the

SMA nor a valid assignee of Solutions's rights under the SMA, and that Services had affirmatively admitted, or at least did not challenge, the validity and efficacy of Pacbell's nonrenewal of the SMA, effective December 1, 2003. TMO moved for summary adjudication of its own third and fourth "cross-claims" for declaratory relief against Services (third), and against both Services and Solutions (fourth), incorporating by reference the arguments in Cingular's motion for summary adjudication.

C.      *Services's and Solutions's motions for summary adjudication*

Also in March 2007, Services filed a motion for summary adjudication of Cingular's twelfth affirmative defense, which alleged that Services's claims were released as part of the settlement in the *TCG v. Cingular* action, and Cingular's and Pacbell's seventh affirmative defenses, which alleged fraud in the inducement with respect to the SMA and SLA. Services argued that it was not a party to the settlement of the *TCG v. Cingular* action and, further, that the settlement agreement expressly provided it did not affect the rights of Solutions or Services. Services contended that defendants' fraud-based affirmative defenses were barred by the doctrines of ratification and estoppel because Pacbell had inquiry notice of the alleged fraud by 1999, but had ratified and affirmed the terms of the SMA and SLA repeatedly since then. Services also argued that defendants had not presented evidence creating a triable issue of fact as to whether the agreements were invalid because of Flynn's alleged conflicts of interest.

Additionally, Services filed a motion for summary adjudication of TMO's fifth cause of action for fraud in its cross-complaint. In that motion, Services argued that TMO's fraud claim was barred by the statute of limitations because its predecessor,

23

Pacbell, had been on notice of the alleged fraud since 1999. Services also argued that there was no triable issue as to fraud by Flynn and, even if such fraud had occurred, Pacbell had ratified and amended the SMA and SLA notwithstanding having notice of the fraud.

V.

*The 2007 Summary Judgment/Adjudication Rulings and Subsequent Events*

The hearing on the summary judgment and summary adjudication motions was held on June 15, 2007 and July 3, 2007 before the Honorable Kevin A. Enright. Just before the second day of the hearing, Services filed an ex parte application to "supplement the record" with new evidence indicating that Cingular learned in 2003 about Flynn's incriminating testimony regarding his conflicts of interest as to the SMA and SLA, and thus had actual knowledge of Flynn's alleged fraud but nevertheless did not seek to void those agreements. Judge Enright denied the application, indicating he did not want to delay the litigation further and no good cause had been shown.

In an order issued on August 21, 2007, Judge Enright granted in their entirety Cingular's and TMO's motions for summary judgment on plaintiffs' fourth amended complaint. The trial court first found that the GSMF Joint Venture, which was the subject of plaintiffs' breach of contract claims, was not a colocation agreement within the meaning of the SMA. The court also found that both the SLA and the SMA were void for fraud in the inducement based on the "undisputed fact . . . that [Flynn] concealed his conflict based on his [] ownership role with O'Neal's companies," and that Flynn violated his duty to Pacbell to disclose such conflicts of interests. The court further concluded

24

that Services had "not shown sufficient admissible evidence that a material issue of fact exists that Cingular and/or TMO knew of such conflict and ratified Mr. Flynn's actions." With respect to Services's Cartwright Act claim, Judge Enright found there was no evidence of a conspiracy to restrain trade or of any antitrust injury to Services.

The foregoing rulings mooted defendants' motions for summary adjudication as to their own cross-claims. The court further ruled that Services's motion for summary adjudication of the fifth cause of action in TMO's cross-complaint was moot because TMO had filed a first amended cross-complaint, and that Services's motion for summary adjudication directed at Cingular's and PacBell's seventh and Cingular's twelfth affirmative defenses was mooted by the court's summary judgment ruling on the fourth amended complaint.

## VI.

### *Defendants' Demurrers to Services's Cross-Complaint and Services's Motion for Reconsideration of the Summary Judgment Ruling*

Shortly after the trial court's August 21, 2007 ruling, both Cingular and TMO filed demurrers to Services's cross-complaint. They argued that Services's cross-complaint was procedurally improper and untimely, that its two claims based on defendants' alleged misrepresentations could not be maintained in light of the trial court's finding that the SMA was unenforceable as a matter of law, and that Services lacked standing to pursue its breach of contract claim because it was not a party or intended beneficiary of the *TCG v. Cingular* settlement agreement.

25

In September 2007, Services filed a motion for reconsideration of the summary judgment order based on newly discovered evidence that Cingular learned in 2003 about Flynn's testimony regarding his conflicts of interest as to the SMA and SLA, and thus knew of Flynn's alleged fraud but did not seek to void those agreements. While this motion was pending, Judge Enright was elevated to the position of Assistant Presiding Judge of the San Diego Superior Court, and this case was reassigned to the Honorable Michael Anello.

Judge Anello denied Services's motion for reconsideration in November 2007, arguing that the evidence presented was not "new," and did not establish that Cingular had actual knowledge of Flynn's alleged fraud. Further, the court found there was no evidence that Cingular affirmatively ratified the agreements after it supposedly learned of Flynn's conflict of interest. In December 2007, Judge Anello sustained TMO's and Cingular's demurrers to Services's cross-complaint, based in part on the trial court's prior ruling that the SMA was voidable for fraud in the inducement as a matter of law, and that Services had no standing under the *TCG v. Cingular* settlement agreement.

In March 2008, Judge Anello sua sponte recused himself under Code of Civil Procedure section 170.1, subd. (a)(6)(iii), which requires disqualification when facts have come to light that may cause a person to reasonably entertain doubts as to the judge's impartiality. Judge Anello provided no details regarding the factual basis for the recusal. The case was reassigned to the Honorable Joan Lewis, who granted Services's motion to vacate Judge Anello's rulings on Services's motion for reconsideration and defendants'

26

demurrers, citing as good cause the lack of information regarding Judge Anello's reasons for recusing himself.

Judge Lewis held a new hearing on the demurrers and motion for reconsideration in January 2009. On January 22, 2009, she issued an order denying Services' motion for reconsideration once again, finding that Services was already in the process of attempting to obtain the purported new evidence before it filed its opposition to the summary judgment motions and could have sought a statutory continuance of the summary judgment hearing, but failed to do so. Judge Lewis sustained defendants' demurrers to the fraud and indemnity claims in Services's cross-complaint without leave to amend based on Judge Enright's earlier summary judgment ruling and her own decision not to reconsider that ruling. She overruled the demurrer to the cause of action arising from the *TCG v. Cingular* settlement agreement as to Cingular and TMO only, because it could "not be determined, as a matter of law and at the pleading stage, the respective rights and obligations of the parties pursuant to the settlement agreement." However, Judge Lewis sustained the demurrer to that cause of action without leave to amend as to defendants SBC, SBC Wireless, and SBC Holdings, concluding those parties were not properly subject to that claim.

VII.

*The 2009 Summary Judgment/Adjudication Motions*

A.    *Plaintiffs' motions*

In March 2009, Flynn moved for summary judgment or, alternatively, summary adjudication of the seventh, eighth, and ninth causes of action in TMO's first amended

27

cross-complaint charging him with fraud and breach of fiduciary duty. Flynn argued those claims were without merit because TMO's predecessor, Pacbell, was on inquiry notice of Flynn's alleged fraud and conflict of interest as far back as 1999. Flynn also argued that (1) there was no evidence TMO incurred any damages as a result of the alleged fraud; (2) TMO had no standing to allege fraud; and (3) Flynn was released in the *TCG v. Cingular* settlement agreement from all claims.

Also in March 2009, Solutions and Services filed their motion for summary judgment, or in the alternative, summary adjudication, as to each of the four causes of action in Cingular's first amended cross-complaint, arguing, among other things, that (1) Cingular lacked standing; (2) the claims were time-barred due to Pacbell's notice of the alleged fraud; and (3) Cingular waived the right to seek rescission of the agreements by not acting promptly upon its suspicions of Flynn's fraud. On similar grounds, Solutions and Services also moved for summary judgment or summary adjudication as to the fraud and rescission claims alleged against them in the fifth, sixth and seventh causes of action of TMO's first amended cross-complaint.

B.      *Defendants' motions*

In April 2009, TMO filed two motions for summary judgment or summary adjudication. The first was directed against Solutions's cross-complaint. Relying on part of Judge Enright's 2007 summary judgment ruling, TMO argued Solutions's claims were barred because the Caltrans Agreement and SMA were both procured by fraud. Based on similar arguments and evidence, TMO also sought summary adjudication of the fifth through ninth causes of action of its own first amended cross-complaint. These claims

28

set forth TMO's allegations of fraud and breach of fiduciary duty arising from Flynn's concealment of its alleged conflict of interest.

In May 2009, Cingular moved for summary adjudication of its fourth cause of action for fraud against Solutions and Services in its first amended cross-complaint. Cingular relied on Judge Enright's earlier findings that voided the SMA and SLA, and argued that the statute of limitations was tolled because it could not have discovered Flynn's fraud earlier. Additionally, Cingular moved for summary judgment on Flynn's cross-complaint, arguing that Pacbell/TMO ─ the only party to assert a cross-claim against Flynn ─ was not a party to the *TCG v. Cingular* settlement agreement and the release contained therein that formed the basis for Flynn's cross claim, and Flynn could not allege or prove any act by Cingular constituting a breach of that agreement.

C.    *The trial court's rulings*

On May 22, 2009, the trial court issued its order on plaintiffs' motions. The court denied Flynn's motion for summary judgment or adjudication directed at TMO's first amended cross-complaint. With respect to Services and Solutions's motion directed at Cingular's first amended cross-complaint, the court granted summary adjudication of the second cause of action against Services for tortious interference with contract based on Cingular's statement that it would not pursue that claim, as well as the fraud cause of action as against Services for lack of evidence that Services itself made any misrepresentations. The court declined to grant summary adjudication of Cingular's fourth cause of action for fraud against Solutions, concluding Solutions had not met its burden of proving that Cingular was on inquiry notice of Flynn's fraud at a point in time

29

that would render its fraud claim untimely. The court also ruled that plaintiffs failed to demonstrate that Cingular did not suffer its own damages arising from the alleged improper assignment of the SMA and SLA to Services, and from Services's attempt to enforce those agreements after the effective date of their nonrenewal. The court's ruling left standing Cingular's first and third causes of action for breach of contract and declaratory relief, respectively. Finally, the court denied Services's and Solutions's motion for summary judgment on TMO's first amended cross-complaint. However, it granted summary adjudication of the fraud claim against Services because there was no evidence Services itself made any misrepresentations.

On August 21, 2009, the trial court issued its rulings on Cingular's and TMO's motions. The court first addressed TMO's motion for summary judgment on Solutions's cross-complaint. At the outset, it observed that with respect to this and all other pending motions, it was not bound by Judge Enright's 2007 summary judgment ruling barring Services's affirmative claims, but rather, the resolution of the motions was "dependent on the law and evidence as presented at this time." The court then denied the motion, ruling that "[e]ven if the evidence supports an affirmative finding that [Flynn's] conduct renders the subject agreements null and void, the Court finds that triable issues of fact exist as to whether TMO and/or its predecessors, ratified the agreements after knowledge of the purported fraud." On the same ground, among others, the trial court also denied in its entirety TMO's motion for summary adjudication of the fifth through ninth causes of action in its first amended cross-complaint. Finally, the trial court granted judgment in TMO's favor on Services's cross-claim for breach of the *TCG v. Cingular* settlement

30

agreement, which was Services's only remaining cross-claim. The court found that Services presented no evidence other than its own subjective intent that the release in that agreement was intended to benefit Services or otherwise entitle it to enforce its terms. For the same reason, the trial court granted summary judgment in Cingular's favor on Services' sole remaining cross-claim.

The trial court also granted Cingular's motion for summary judgment on Flynn's cross-complaint on the ground that because TMO acquired Pacbell in January 2005 and there was no evidence that Cingular exerted any control over Pacbell after that time, Cingular could not be held accountable for Pacbell/TMO's decision to sue Flynn. Finally, the court ruled that as to Services, Cingular's motion for summary adjudication of its fourth cause of action for fraud was mooted by the court's May 22, 2009 order. The court denied the motion as to Solutions on the ground Cingular failed to establish its entitlement to the claimed damages as a matter of law.

VIII.

*The Trial of Remaining Claims, the Jury's Special Verdict,*
*and the Final Judgment*

In August 2009, Cingular voluntarily dismissed its sole remaining cross-claim for fraud in its first amended cross-complaint and extricated itself from the litigation. In September 2009, TMO dismissed the first, second and third causes of action in its first amended cross-complaint, and also dismissed the fourth and fifth causes of action as to Services only. As a result of the extensive pretrial motion practice and these voluntary dismissals, the only claims remaining for trial were those that Solutions alleged in its

31

cross-complaint against TMO, and the causes of action in TMO's first amended cross-complaint for (1) rescission of the Caltrans Agreement, SLA, and SMA (against Solutions and Services); (2) fraud (against Solutions and Flynn); (3) breach of fiduciary duty (against Flynn); and (4) declaratory relief to establish the SMA was terminated effective December 1, 2003 (against Solutions and Services).

The jury trial on these claims commenced on October 20, 2009, presided over by the Honorable Frederic L. Link.  On November 20, 2009, the jury rendered its special verdict.  On Solutions's breach of contract cross-claim, the jury found that the Caltrans Agreement was procured by fraud, but TMO ratified the agreement notwithstanding the fraud and breached the agreement when it failed to pay amounts owed under it to Solutions.  The jury awarded damages to Solutions in the amount of $114,400.96 on that claim.  The jury found that Solutions was entitled to an accounting under the SMA.  In connection with the accounting claim, the jury found the SMA was terminated as of December 1, 2003.  The jury awarded Solutions $1,780,613.35 on its "goods and/or services rendered" claim, which the jury found had not been the subject of fraud.  The jury found against TMO on its claims for rescission of the Caltrans Agreement, the SMA, and the SLA, finding that even though TMO was entitled to rescind those agreements, it had waived its right to do so.  Additionally, the jury found that Solutions made false representations to TMO, but TMO's reliance on the representations did not cause it harm.  Finally, the jury found Flynn breached his fiduciary duties and committed fraud, but TMO waived its right to seek damages based on that conduct.

32

TMO filed a motion for judgment notwithstanding the verdict (JNOV), challenging the damages awarded for goods delivered and services rendered and the award of an accounting.  On March 12, 2012, the trial court entered a judgment that, over the objections of the parties, reflected only the jury's verdict and not the earlier rulings issued by Judges Enright and Lewis.  In response to TMO's JNOV motion, the trial court struck the jury's award of an accounting on the ground that it would amount to a double recovery, but left untouched the damages awarded to Solutions on its goods and services claim.

## DISCUSSION

### SERVICES'S AND FLYNN'S APPEALS

### I.

### *The 2007 Summary Judgment/Adjudication Rulings*

Services contends the trial court's 2007 summary judgment order was improper because it relied on factual findings and violated due process.

A.    *Summary judgment standards*

The standards by which we review the trial court's order granting summary judgment, or alternatively, summary adjudication, are well established.  Under Code of Civil Procedure section 437c, subdivision (c), summary judgment shall be granted only "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  A motion for summary adjudication as to any cause of action, affirmative defense or claim for damages shall "proceed in all procedural respects as a motion for summary judgment," and shall be

evaluated according to the same legal principles. (Code Civ. Proc., § 437c, subd. (f)(2);

see *Grant-Burton v. Covenant Care, Inc*. (2002) 99 Cal.App.4th 1361, 1370 ["the

principles governing summary judgment also apply to summary adjudication"].)

In *Aguilar v. Atlantic Richfield Co*. (2001) 25 Cal.4th 826, 843 (*Aguilar*), the

California Supreme Court clarified the standards governing motions for summary

judgment and summary adjudication: "First, and generally, from commencement to

conclusion, the party moving for summary judgment bears the burden of persuasion that

there is no triable issue of material fact and that he is entitled to judgment as a matter of

law. . . .There is a triable issue of material fact if, and only if, the evidence would allow a

reasonable trier of the fact to find the underlying fact in favor of the party opposing the

motion in accordance with the applicable standard of proof." (*Aguilar, supra,* 25 Cal.4th

at p. 850.) The moving party bears the initial burden of production to show the

nonexistence of any material triable issue, and if he does so, the burden switches to the

opposing party to make a prima facie showing of such a triable issue. (*Ibid*.) "[H]ow the

parties moving for, and opposing, summary judgment may each carry their burden of

persuasion and/or production depends on *which* would bear *what* burden of proof at

trial." (*Id*. at p. 851.) Thus, a defendant moving for summary judgment against a

plaintiff who has the burden of proof by, say, a preponderance of the evidence, "must

present evidence that would require a reasonable trier of fact *not* to find any underlying

material fact more likely than not ─ otherwise, *he* would not be entitled to judgment *as a*

*matter of law*, but would have to present *his* evidence to a trier of fact." (*Ibid*.)

34

In ruling on a summary judgment motion, the trial court determines only whether triable issues of fact exist; it does not resolve those issues. (*EHP Glendale, LLC v. County of Los Angeles* (2011) 193 Cal.App.4th 262, 270.) The court must consider all of the evidence and inferences to be drawn from it, and determine "what any evidence or inference *could show or imply to a reasonable trier of fact*." (*Aguilar, supra*, 25 Cal.4th at p. 856.) Therefore, "if any evidence or inference therefrom shows or implies the existence of the required element(s) of a cause of action [or defense], the court must deny [a] motion for summary judgment or summary adjudication because a reasonable trier of fact could find for the [opposing party]." (*Smith v. Wells Fargo Bank*, N.A. (2005) 135 Cal.App.4th 1463, 1474 (*Smith*).)

A trial court's order granting a motion for summary judgment or summary adjudication is reviewed de novo. (*Smith, supra*, 135 Cal.App.4th at p. 1471.) We " 'exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact . . . ." ' " (*Id*. at p. 1474.) " ' "The appellate court must examine only papers before the trial court when it considered the motion, and not documents filed later. . . ." ' " (*Ibid.*; Code Civ. Proc., § 437c, subds. (b), (c) [supporting and opposing papers must be supported by affidavits, declarations, admissions and other evidence, and the motion must be decided on "the papers submitted"]; see also *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [on review, appellate court "consider[s] all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained."]; *L&B Real Estate v. Superior Court* (1998)

67 Cal.App.4th 1342, 1346 ["we will consider only the facts properly before the trial court at the time it ruled on the motion"].)[8]

B.      *The trial court properly admitted Flynn's prior testimony*

Services contends that in connection with the 2007 summary judgment motions, the trial court improperly admitted, over Services's objection, certain testimony of Flynn from the 2002 arbitration between Flynn and O'Neal, during which Flynn admitted (according to defendants) to having an ownership and financial interest in both OCG and Solutions at the time the SMA and SLA were executed, and also acknowledged concealing those interests from Pacbell.[9]  Services argues that the court should have excluded Flynn's prior testimony because it did not satisfy the requirements of Evidence Code section 1292.[10]  However, the trial court admitted the testimony under sections 1221 and 1222, as adoptive and authorized admissions, respectively.  We review independently the trial court's decision to apply the hearsay exceptions for admissions, rather than those addressing prior testimony, to the facts presented (see *Gatton v. A.P.*

---

[8]      For this reason, we restrict our review on this appeal to the record before Judge Kevin Enright at the time of the 2007 summary judgment motions, and reject Services's suggestion that we consider evidence been submitted on later summary judgment motions or adduced at trial, as well as the rulings and remarks of subsequent trial judges who presided over later phases of the case but did not act as triers of fact, which statements, in any event, do not constitute "evidence."

[9]      In the trial court, Services also objected to the admission of Flynn's prior testimony in the 2003 *TCG v. O'Neal* litigation – a proceeding to which Services acknowledged it was a party.  However, Services does not explicitly challenge the admission of the 2003 testimony on appeal.

[10]      For purposes of the discussion in this section only, all further statutory references are to the Evidence Code.

36

*Green Services, Inc.* (1998) 64 Cal.App.4th 688, 692), and conclude the court properly admitted Flynn's prior testimony.

Section 1292 concerns the admissibility of statements made by a declarant at the former proceeding "against a stranger to that prior action." (1 Witkin, California Evidence (5th ed. 2012) Hearsay § 266, p. 1136 (Witkin Evidence).) It provides that such testimony is not inadmissible if the declarant is unavailable in the current civil proceeding, and the party against whom the testimony previously was offered "had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which the party against whom the testimony is [currently] offered has at the hearing." (§ 1292, subd. (a)(3).) There is no dispute that Flynn was not "unavailable" during the current proceedings and, thus, an essential prerequisite to the application of section 1292 was not met here. Regarding the trial court's determination that Flynn's 2002 testimony was *independently* admissible against Services under sections 1221 (adoptive admissions) and 1222 (authorized admissions), Services argues, in effect, that prior testimony is admissible *only* if it satisfies the requirements of sections 1291 or 1292, which, it contends, are more specific than the hearsay exceptions for admissions. To hold otherwise, Services maintains, would be to nullify sections 1291 and 1292.

Services's arguments have no merit. First, neither section 1291 nor 1292 purports to be the exclusive means by which former testimony may be admitted, i.e., they do not provide that prior testimony of a declarant is admissible *only* in the circumstances described in those specific provisions, regardless of whether that evidence may satisfy another hearsay exception. Moreover, Services cites no authority for the proposition that

37

evidence that is inadmissible under one hearsay exception must be excluded even if it satisfies another hearsay exception. To the contrary, it is hornbook law that hearsay is inadmissible "[u]nless it comes within *one* of the established exceptions to the hearsay rule . . . ." (Witkin Evidence, *supra*, § 1, p. 783; italics added.)

We conclude Flynn's testimony statements in question were admissible as authorized admissions under section 1222.[11] Services was not a party to the 2002 arbitration. However, Services was in existence during the 2002 arbitration, and it *was* a party to the 2002 Flynn/O'Neal Settlement (made effective as of December 31, 2001) which was designed, in part, to resolve the claims at issue during the arbitration, and pursuant to which Services purportedly was assigned various of Solutions' rights under the SMA. It is also undisputed that at the time of the arbitration, Flynn was the president and a principal owner of Services and was authorized to speak on its behalf, including on the subject matter that is the focus of this action, i.e., the validity of the agreements on which Services bases its claims.

Because of his ownership and control of Services, Flynn's 2002 statements constitute authorized admissions. Significantly, Services does not dispute this on appeal, and did not dispute it in the trial court. For this additional reason, we uphold the admission of his 2002 arbitration testimony under section 1222 as authorized admissions.

---

11    Section 1222 provides: "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if: [¶] (a) The statement was made by a person authorized by the party to make a statement or statements for him concerning the subject matter of the statement; and [¶] (b) The evidence is offered either after admission of evidence sufficient to sustain finding of such authority or, in the court's discretion as to the order of proof, subject to the admission of such evidence."

38

(See, e.g., *Cahill v. San Diego Gas & Elec. Co.* (2011) 194 Cal.App.4th 939, 956

[" ' "When an appellant fails to raise a point, or asserts it but fails to support it with

reasoned argument and citations to authority, we treat the point as waived." ' "].)

C.  *Services's other evidentiary challenges to the 2007 summary judgment
    ruling fail for lack of a showing of prejudice*

Services contends the trial court erred in permitting TMO and Cingular to submit

additional evidence with their reply papers in support of their 2007 summary judgment

motions without granting a continuance and providing Services an opportunity to respond

to the "new" evidence.  TMO and Cingular both argue that the trial court had discretion

to allow the additional evidence.  They note that Services did not ask the trial court for a

continuance and has not demonstrated on appeal how it was prejudiced by the trial court's

ruling.

Code of Civil Procedure section 437c "does not expressly or impliedly *prohibit* the

inclusion of evidentiary matter with the reply."  (*Weiss v. Chevron, U.S.A., Inc.* (1988)

204 Cal.App.3d 1094, 1098 (*Weiss*), italics added.)  Indeed, the statute instructs that

when determining whether there are triable issues of fact, the trial court should "consider

all the evidence set forth in the papers," except that to which objections have been

sustained.  (Code Civ. Proc., § 437c, subd. (c).)  On the other hand, the statute makes no

explicit "*allowance* for submitting additional evidence or filing a supplemental separate

statement" with the reply.  (*San Diego Watercrafts, Inc. v. Wells Fargo Bank, N.A.* (2002)

102 Cal.App.4th 308, 313, italics added (*San Diego Watercrafts, Inc.*)  In the absence of

a firm rule prohibiting or allowing the submission of new material with the reply papers,

39

whether to consider such evidence "rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*Id*. at p. 316.)

In exercising that discretion, the trial court should consider due process implications. (*San Diego Watercrafts, Inc.*, *supra*, 102 Cal.App.4th at p. 316.) " 'The due process aspect of the separate statement requirement is self-evident ─ to inform the opposing party of the evidence to be disputed to defeat the motion.' [Citation.]" (*Ibid*.) Courts generally have held that "consideration of such additional evidence is not an abuse of discretion so long as the party opposing the motion for summary judgment has notice and an opportunity to respond to the new material." (See, e.g., *Plenger v. Alza Corp.* (1992) 11 Cal.App.4th 349, 362, fn. 8.) Contrary to Services' apparent contention, the trial court is not *required* in all instances to disallow the additional evidence absent a further response from the opposing party. For example, the opposing party may effectively waive any challenge to the admission of such evidence if it does not object to it, does not request a continuance or opportunity to respond, or does not suggest that it *could* respond to the additional evidence. (*Ibid*.)

Additionally, we do not believe a trial court abuses its discretion in allowing additional evidence in reply if the opposing party chooses only to interpose a technical procedural objection to the evidence without requesting a continuance to allow a response or otherwise suggesting it would actually be prejudiced by its admission. (See *Weiss*, *supra*, 204 Cal.App.3d at p. 1099 [no abuse of discretion where opposing party "remain[ed] fast to a technical procedural objection" and did not avail itself of the

40

opportunity to counter the evidence].) We believe this case presents such a scenario. Services made only a procedural objection to defendants' submission of additional evidence with the reply papers and asked that the evidence be stricken. It did not request a continuance or an opportunity to respond, and it made no argument that it would be prejudiced by the court's consideration of the evidence. Like the plaintiff in *Weiss*, Services decided to rest on its technical objection alone and "gamble against an unfavorable ruling." (*Weiss*, *supra*, 204 Cal.App.3d at pp. 1100-1101.) Services lost that gamble.

On appeal, Services makes no real effort to refute defendants' arguments that the evidence was not new and, in any event, was not prejudicial. Services responds that the mere fact the evidence was not new to Services or the case because it was the subject of discovery does not in itself eliminate the due process concerns associated with the submission of additional evidence with summary judgment reply papers. Although that may be true as a general proposition, Services's assertion does nothing to show that it was actually prejudiced by the allowance of the additional evidence on reply. Its failure to show any such prejudice compels us to uphold the trial court's ruling. (See, e.g., *Red Mountain, LLC v. Fallbrook Public Utility District* (2006) 143 Cal.App.4th 333, 347 (*Red Mountain*) ["[A]n appellant has the burden to show not only that the trial court erred but also that the error was prejudicial."]; Cal. Const., art. VI, § 13; Code Civ. Proc., § 475 ["No judgment, decision or decree shall be reversed or affected by reason of any error . . . unless it shall appear from the record that such error . . . was prejudicial"].)

41

For the same reason, we reject Services' contention that in its ruling granting defendants' summary judgment motions, the trial court erred in citing certain demonstrative evidence that defendants used at the hearing. The court permitted defendants to lodge the demonstrative evidence with court and overruled Services's objection to its introduction, but stated it was "not taking evidence" and the demonstrative evidence "would not be evidence." It is unclear why the trial court referenced this material, since it did not constitute evidence, but rather included, among other things, enlargements of certain portions of one of the agreements at issue, as well as flow charts of the parties' respective claims. However, because Services identifies no prejudice resulting from this single citation in the trial court's summary judgment order, the citation provides no basis for reversal. (*Red Mountain, supra*, 143 Cal.App.4th at p. 347.)

D.      *The trial court correctly ruled as a matter of law that the SMA and SLA were unenforceable because they were fraudulently induced*

In its 2007 summary judgment ruling, the trial court determined that both the SLA and the SMA had been procured by fraud due to Flynn's undisclosed conflict of interest, and thus were voidable and unenforceable by Services. The court ruled that the SLA was void "due to the undisputed fact . . . that [Flynn] concealed his conflict based on his [] ownership role with O'Neal's companies[,] which bid on a [Pacbell] contract to manage cell tower leases, at the time he worked for [Pacbell]." The court further ruled that "TMO's entitlement to grant of summary judgment is supported by Mr. Flynn's deposition admission . . . where he adopted his testimony from the earlier Arbitration

42

proceeding, that such testimony was truthful and under oath. His [deposition and arbitration testimony] support that although he had a duty to disclose his conflicting interests in companies that bid on [Pacbell] contracts to provide cell tower site award and management duties, he did not. This fraud in the inducement supports [defendants] voiding the SMA and SLA. Moreover, [Services] has not shown sufficient admissible evidence that a material issue of fact exists that Cingular and/or TMO knew of such conflict and ratified Mr. Flynn's actions." Services contends the court's summary judgment order was improper because there were triable issues of fact as to whether defendants ratified and waived the right to rescind the SMA and SLA.[12] We disagree.

We note that at various points in this litigation the parties tended to view the legal standards governing waiver and ratification as indistinguishable, and TMO expressly states they are indistinguishable in its respondent's brief. Waiver and ratification are overlapping concepts in contract law because ratification is a form of waiver, as illustrated by the principle that "one who, after discovery of an alleged fraud, ratifies the original contract by entering into a new agreement granting him substantial benefits with respect to the same subject matter, is deemed to have waived his right to claim damages for fraudulent inducement." (*Oakland Raiders v. Oakland-Alameda County Coliseum, Inc.* (2006) 144 Cal.App.4th 1175, 1186 (*Oakland Raiders*); *Channell v. Anthony* (1976) 58 Cal.App.3d 290, 304 [claim for damages for fraud may be waived by acquiescence or ratification of the transaction].) The *Oakland Raiders* court referred to such ratification

---

12    At oral argument before this court, plaintiffs' counsel conceded there is no triable issue of fact as to Flynn's conflict of interest and fraud.

by conduct as "implied waiver" of the right to sue for fraud. (*Oakland Raiders, supra,* 144 Cal.App.4th at pp. 1191-1194.)

1.     Ratification

An inherent element of ratification or implied waiver of the right to sue for fraud is that the defrauded party must have full and actual knowledge of the essential facts of the claimed fraud.  (*Oakland Raiders, supra,* 144 Cal.App.4th at pp. 1192-1193; *Fergus v. Songer* (2007) 150 Cal.App.4th 552, 571.)  Whether the defrauded party has ratified the fraudulent transaction "depends primarily on the intention of the party defrauded as shown by his declarations, acts, and conduct.  [Citation.]  It is necessary that ratification be with full knowledge of the party's rights and be clearly shown.  Even in the case of deliberate election after discovery of fraud, equity may give relief against ratification by conduct that is merely thoughtless or inadvertent."  (*Chung v. Johnston* (1954) 128 Cal.App.2d 157, 164.)

Although ratification or implied waiver of fraud is ordinarily a question of fact to be determined in connection with the circumstances of each case (*ibid.*), the issue "may be determined as a matter of law where the underlying facts are undisputed [citation], or the evidence is susceptible of only one reasonable conclusion[.]"  (*Oakland Raiders, supra,* 144 Cal.App.4th at p. 1191.)  The burden is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation.  (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)  Doubtful cases will be decided against a waiver.  (*Ibid.*)

Services contends that knowledge of Flynn's fraud may be imputed to defendants because they were on "inquiry notice" of the fraud and failed to properly investigate the "red flags" suggesting his misconduct. A finding of ratification or waiver of fraud, however, requires evidence that the defrauded party had *actual and full knowledge* of the fraud; mere inquiry notice is not enough. (*Oakland Raiders*, *supra*, 144 Cal.App.4th at pp. 1192-1193; *Gabriel Technologies Corp. v. Qualcomm Inc*. (S.D. Cal 2009) 2009 U.S. Dist. LEXIS 98379, at *23 ["notice and a duty to investigate do not satisfy *Oakland Raiders'* requirement of actual knowledge of fraud"].)

Services relies on inapposite cases involving the issue of whether a principal may be deemed to have ratified an agent's fraudulent acts, and thus be held liable for a *third-party* victim's damages arising from the fraud. In that scenario, "the law [ordinarily] requires that a principal be apprised of all the facts surrounding a transaction before he will be held to have ratified the unauthorized acts of an agent. However, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man upon inquiry, he may be held to have ratified despite lack of full knowledge." (*Volandri v. Hlobil* (1959) 170 Cal.App.2d 656, 659; see also *Reusche v. California Pacific Title Ins. Co*. (1965) 231 Cal.App.2d 731, 737.) Services cites no case applying these principles to the situation in the present case, where the principal (here TMO), rather than a third party, is the alleged victim of the fraud.

2.     Waiver of right to rescind

Although the requirements for proving waiver of the right to rescind overlap with the requirements for proving ratification of contract induced by fraud, waiver of the right to rescind and ratification are different mechanisms for avoiding a fraud in the inducement claim.  A party who has been induced by fraud to enter into a contract has a choice of remedies.  That party may either rescind the agreement, or it may affirm it and sue for damages.  (See 27 Williston on Contracts (4th ed. 2003) Fraud and Misrepresentation, § 69.47, pp. 99-100; *Schmidt v. Mesmer* (1897) 116 Cal. 267, 270; *Akin v. Certain Underwriters at Lloyd's of London* (2006) 140 Cal.App.4th 291, 296; *City of Vista v. Robert Thomas Securities, Inc.* (2000) 84 Cal.App.4th 882, 889.)  The aggrieved party may also assert the fraud as a defense to an action for breach of the fraudulently induced contract.  (*Filet Menu, Inc. v. C.C.L. & G., Inc.* (2000) 79 Cal.App.4th 852, 861 [aggrieved party may either seek to rescind the contract or affirm the contract and sue for damages or set up the fraud as a defense]; *J.B. Colt Co. v. Freitas* (1926) 76 Cal.App. 278, 287 [fraud may be proved as a defense to an action to enforce a contract and neither the statute of limitations nor the doctrine of laches will bar the defense]; see also *Gordon v. Beck* (1925) 196 Cal. 768, 771-772 [a principal who lacks knowledge of the duplicity of its agent may be relieved of the obligations of a contract with the opposing principal either by affirmative action to rescind the contract or by asserting the dual agency as a defense in an action to enforce the contract].)

Conduct on the part of the injured party may amount to a waiver of the right to rescind.  "Where a party has *full knowledge* of facts which would warrant his rescinding

an agreement but nevertheless accepts and receives benefits accruing thereunder, waiver of the right to rescind will be presumed." (*Palmquist v. Palmquist* (1963) 212 Cal.App.2d 322, 331 (*Palmquist*), italics added; see also *Union P.R. Co. v. Zimmer* (1948) 87 Cal.App.2d 524, 532 (*Union Pacific*)].) "[M]ere uncertainty is not knowledge." (*Union Pacific, supra*, at p. 532.) "Courts of equity will not withhold relief from [defrauded] parties . . . upon the ground that there were circumstances calculated to arouse their suspicion and cause an investigation whereby they might have discovered the swindle." (*Eichelberger v. Mills Land & Water Co.* (1908) 9 Cal.App. 628, 638.)[13] Thus, waiver of the right to rescind a fraudulently induced contract and ratification of the contract both require full and actual knowledge of the fraud that would entitle the injured party to rescind.

The actual knowledge standard for waiver and ratification is illustrated by *Warfield v. Richey* (1959) 167 Cal.App.2d 93, in which plaintiffs leased a hotel and motel from defendant, allegedly based on defendant's representation regarding the prior year's gross income of the properties, which proved to be false. (*Id*. at p. 95.) Defendant argued, among other things, that plaintiffs waived their right to rescind the lease agreement and seek damages for the misrepresentation. The court disagreed, stating: "It

---

13    The rule that " 'means of knowledge is equivalent to knowledge, and that a party who has the opportunity of knowing the facts constituting the fraud of which he complains cannot be supine and inactive and afterward allege a want of knowledge that arose by reason of his own laches or negligence' " applies to whether an action has been brought within the applicable statute of limitations; it does not apply to a determination of whether a party has the right to rescind a contract based on fraud. (*Eichelberger v. Mills Land & Water Co., supra,* 9 Cal.App. at pp. 637-638.)

47

must further be noted that before an offended party in a fraud case may be effectively charged with waiver or estoppel, *there must be full knowledge on the part of the offended part of all the facts relating to the fraud.* It is apparent in the case at bar that the facts in their total effect were coming to the plaintiffs piecemeal, and the full disclosure of defendant's false representation respecting the prior year's income did not actually arrive until the trial of this cause." (*Id*. at p. 98, italics added.) Similarly, in *Schaub v. Schaub* (1945) 71 Cal.App.2d 467, the defendant wife in a proceeding to annul a marriage contract asserted that her husband had ratified the marriage with knowledge of his wife's infidelity. The court concluded, however, that "[n]otwithstanding plaintiff's testimony that he believed his wife was carrying on illicit relations . . . , it appears his belief was founded upon suspicion and not upon knowledge of the facts. . . . *Suspicion or a belief founded upon inconclusive circumstances is not the 'full knowledge of the facts constituting the fraud' which constitutes ratification* . . . . (*Id*. at p. 480.)

Thus, to establish that defendants ratified or waived the right to rescind the subject agreements, plaintiffs were required to prove by clear and convincing evidence both that defendants had full knowledge of Flynn's conflict of interest (i.e., fraud) and, with that knowledge, engaged in unequivocal conduct demonstrating their intention to affirm the agreement and waive their right to sue for fraud. (*Oakland Raiders, supra,* 144 Cal.App.4th at pp. 1185-1186; *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31.) " ' "[W]here a party, with full knowledge, declines to repudiate a transaction known to him to be fraudulent, and fully and expressly ratifies it, he can neither rescind nor maintain an action for damages." ' " (*Oakland Raiders, supra,* 144 Cal.App.4th at

48

pp. 1192-1193.)  Applying the full-knowledge standard, we conclude the trial court properly found the evidence before it on the 2007 summary judgment motions was insufficient to raise a triable issue of fact as to whether defendants waived the right to rescind or ratified the subject contracts.  We will address the evidence that Services cites on appeal as raising a triable issue of fact as to ratification and waiver.

3.     The 1999 investigation

In its opening brief, Services contends that Pacbell was on *inquiry notice* of the fraud in 1999 when it received an anonymous e-mail accusing Flynn of having set up O'Neal at "yet ANOTHER company."  However, as we discussed, a finding of ratification or waiver of fraud requires evidence that the defrauded party had *actual and full knowledge* of the fraud; mere inquiry notice is not enough.  (*Oakland Raiders, supra*, 144 Cal.App.4th at pp. 1192-1193; (*Eichelberger v. Mills Land & Water Co., supra*, 9 Cal.App. at pp. 637-638.)

Citing the written report of the 1999 investigation by Pacbell security personnel, and King's deposition testimony regarding his concerns about the business relationship between Flynn and O'Neal in 1999 that caused him to request the investigation, Services contends King became aware of Flynn's conflict of interest based on the anonymous e-mails he received and other communications that raised questions about Flynn and O'Neal's relationship.  Services argues that a trier of fact could infer ratification or waiver from the fact that the investigators did not ask questions about the SLA and SMA even though Flynn signed those agreements, and the fact that King sent a written statement to

49

the investigators that emphasized the benefits of the agreements and did not mention any concerns about Flynn's conflict of interest.

The evidence that Services cites does not show King had actual knowledge of Flynn's conflict of interest. King's deposition testimony showed that in 1999 he had "concerns," which he described as "red flags or indicators that there might be some things going on that would cause us to be concerned about [Flynn and O'Neal's] business relationship." The anonymous information he received suggested to him that "there might be something deeper." King's testimony at most shows that he had suspicions about Flynn's relationship with O'Neal; it does not raise a reasonable inference that he had full knowledge of Flynn's conflict of interest and fraud. As noted, suspicion or a belief founded on inconclusive circumstances does not constitute full knowledge of all facts relating to a fraud and therefore is insufficient to charge an offended party with ratification of the fraud. (*Schaub v. Schaub, supra,* 71 Cal.App.2d at p. 480.)

Nor does the report of the 1999 investigation evidence full knowledge of Flynn's conflict of interest. The report states that "[t]he anonymous e-mails indicated Flynn was a close personal friend of Charles O'Neal, O'Neal Communications Group, Inc., which is a contract company to [Pacbell]. The e-mails also allege that Flynn directly awarded a contract bid to O'Neal and was receiving 'kick backs' by way of money, an automobile, and real property . . . ." However, as noted, the report cleared Flynn of any wrongdoing, concluding that the RFP process for finding a replacement site acquisition company was "followed and verified by procurement;" that Flynn and O'Neal informed Pacbell of their relationship; that "Flynn denies giving O'Neal inside competitive bid information so OCG

50

would be awarded [the Caltrans contract];" that "Flynn denies receiving any compensation from O'Neal, for the award of the contract;" and that "O'Neal denies receiving or giving any compensation to anyone for the award of the contract."

Flynn admitted in the 2002 arbitration that the 1999 investigation "cleared" him of having a conflict of interest because he lied to Pacbell. Thus, Pacbell's continuing to perform the subject agreements in reliance on Flynn's intentional misrepresentations and concealment cannot be deemed ratification of the agreements procured by Flynn's fraud. "[T]here is no waiver of fraud when the acts constituting the waiver have themselves been induced by fraud." (*Channell v. Anthony, supra,* 58 Cal.App.3d at p. 304.) The evidence concerning the 1999 investigation of Flynn does not raise a triable issue of fact as to whether defendants ratified or waived the right to rescind the SLA and SMA.

4.    April 2000 meeting

Services contends there is evidence that in April 2000, Pacbell's representatives believed Flynn had an ownership interest in Solutions before he left Pacbell. Services cites the deposition testimony of former Pacbell vice president Shawn O'Connor that Cumbie and Vranek were concerned about the fact Flynn became president of OCG shortly after he left Pacbell. At a meeting between representatives of Pacbell and OCG that Flynn, but not O'Neal, attended on behalf of OCG, Cumbie asked Flynn "about the whereabouts of O'Neal." Flynn told Cumbie that O'Neal had left OCG for personal reasons and that he (Flynn) would thereafter be responsible for meeting the "deliverables" under the contract. O'Connor believed Cumbie was concerned that Flynn potentially had a conflict of interest. O'Connor's testimony regarding Vranek and Cumbie's concerns

51

about Flynn's involvement with OCG and possible conflict of interest is not evidence that Pacbell's representatives had *actual knowledge* that Flynn had an ownership interest in Solutions before he left Pacbell.

5.      Events of November 2000

Services contends a reasonable inference of waiver or ratification can be drawn from evidence regarding events that occurred in November 2000. Services first contends waiver or ratification can be inferred from the facts that Rick Quist, in-house counsel for Pacbell's parent company SBC, advised Pacbell's in-house counsel Alejandro Jimenez to challenge the validity of the agreements with Solutions, and Pacbell disregarded that advice. However, in support of that contention, Services cites Quist's deposition testimony that he shared with Jimenez his concerns about whether the agreements had been properly authorized; the testimony does not show that Quist advised Jimenez to challenge the validity of the agreements. Quist testified: "I recall asking whether or not the agreements were initialed or had some other transmittal authorizing their execution, and in the absence of those documents, I would question the validity of the those agreements."

Services next contends that during and after a meeting on November 27, 2000 between Flynn, Schlecht, and Cumbie to discuss Pacbell/SBC's concerns about the effect of the SMA on SBC's tower lease and management agreement with SpectraSite, Pacbell accused Flynn of a conflict of interest in executing the SMA on behalf of Pacbell. The evidence that Services cites includes a letter from Flynn to Schlecht the day after the November 27 meeting in which Flynn states: "I was accused [at the November 27

52

meeting] of having exceeded my authority in executing the [SMA] on behalf of [Pacbell] while I was employed at [Pacbell] and that, as a result, [Pacbell] believed the contract was potentially invalid." Flynn further noted that Schlecht and Jimenez "threatened [Solutions] with burdensome litigation, as well as threatening me personally with ongoing and extensive litigation." The evidence also includes Flynn's 2007 deposition testimony that Schlecht told him at the November 27 meeting "that these [agreements] were entered into fraudulently, I had a conflict of interest, that I ended up . . . at Solutions even though I had signed agreements at [Pacbell], I had violated my signing authority . . . in an attempt to get these agreements in place, and that he was going to sue me personally, sue Solutions, and rescind the agreements." Services cites Cumbie's deposition testimony that "the fact that Mr. Flynn signed the [Solutions] agreement on behalf of [Pacbell and] then became an employee and/or principal of TCG and [Solutions] was a cause of concern."

Services also cites a December 1, 2000 letter from Schlecht to O'Neal questioning Flynn's authority to sign the SMA on behalf of Pacbell. Schlecht's letter disputed Flynn's contention that at the time he signed the SMA, he had signing authority from [Pacbell] of up to $1 million. Schlecht asserted that Flynn lacked authority to obligate Pacbell for more than $10,000 per year, and that Flynn was now claiming that the SMA "creates an obligation to [Pacbell] of $4 million!" Thus, Schlecht concluded it was "entirely appropriate for [SBC/Pacbell] to raise questions about the validity of the [SMA]." Schlecht testified at his deposition that the SMA "seemed suspicious" and there were "red

flags," including that Flynn may have exceeded his authority in signing the SMA on behalf of Pacbell.

Finally, Services cites a joint defense agreement in which Pacbell and SBC informed SpectraSite that "SBC intends to either (i) terminate the purported [SMA] and negotiate a settlement with [Solutions] or (ii) obtain a final judicial or arbitral determination of either the invalidity of the [SMA] or of SBC's liability thereunder." Services argues that Pacbell/Cingular ratified the Solutions agreements by, among other conduct, continuing to perform the agreements and signing amendments to them in which they expressly "ratified and affirmed" them.

None of this evidence raises a reasonable inference that defendants had actual and full knowledge that Flynn had an ownership interest in Solutions when he signed the agreements with Solutions on behalf of Pacbell. Rather, it shows that the suspicions and red flags that caused defendants to question the validity of those agreements concerned Flynn's authority to sign the agreements on behalf of Pacbell. Quist testified that he would question the validity of the agreements if there was no documentation "authorizing their execution." In Flynn's letter to Schlecht regarding the November 27 meeting, Flynn stated, "I was accused of having exceeded my authority in executing the [SMA] on behalf of [Pacbell] while I was employed at [Pacbell.]" Although Flynn testified in his deposition that Schlecht accused him of having a conflict of interest and entering the agreements fraudulently, he added that the alleged conflict of interest concerned his violating his "signing authority . . . in an attempt to get these agreements in place . . . ." Similarly, Schlecht's December 1, 2000 to O'Neal challenged Flynn's authority to sign the

54

SMA on behalf of Pacbell, taking the position that Flynn's signing authority from Pacbell was limited to obligations of $10,000 per year. The evidence of defendants' concerns in November 2000 about Flynn's authority to sign the subject agreements on behalf of Pacbell does not raise a reasonable inference that defendants had full knowledge of Flynn's fraud.

6.      March 2002 investigation

Services contends that in March 2002, Pacbell received further allegations of Flynn's fraud but made a strategic decision not to investigate the Solutions agreements. The March 2002 investigation by Pacbell (then doing business as Cingular Wireless) concerned an anonymous letter alleging that Flynn and O'Conner had each awarded a contract without competitive bidding as a vice president of Pacbell. The letter alleged Flynn awarded a contract to OCG in 1995 or 1996, and O'Connor awarded a contract to TCG in 2002. O'Connor then resigned from Pacbell and became an employee of TCG, where, according to the anonymous letter, he managed the contract he had awarded.

Cingular's investigation concluded the following: OCG was operating as TCG; O'Connor had left Cingular and January 2002 and was working for TCG; O'Connor's title at Cingular was operations manager, not vice president; O'Connor and Flynn were close associates outside of work; TCG was awarded a contract in 2001 after a competitive bid process was followed and approved; Cingular did not enter any new contracts with TCG in 2002; and Cumbie approved the purchase orders for TCG in January 2002. The investigation was limited to the allegations in the anonymous letter; it did not involve suspicions concerning Flynn's conflict of interest or interest in Solutions when he was an

55

employee of Pacbell.  There is no evidence that Cingular's limiting the investigation to the anonymous allegations involved a "strategic decision" to not investigate the Solutions agreements.

7.      April 2003 trial

Services argues that Pacbell gained full knowledge of Flynn's fraud and conflict of interest in April 2003 when attorney Stephanie Hess, representing Cingular, attended the trial in *TCG v. O'Neal* and heard Flynn give testimony indicating that he and O'Neal started Solutions together.  O'Neal's counsel asked Flynn to admit that he signed a declaration saying he did not have a conflict of interest between his employment with Pacbell and his "ownership interest in, or lack thereof, in [TCG] . . . ."  Flynn answered that he "would have to see the document, but that was one issue that both O'Neal and I did not discuss."  Counsel then asked Flynn to admit that in the 2002 arbitration between him and O'Neal, "you signed a declaration saying you didn't have an interest when in fact you did?"  Flynn answered, "That's probably true, correct."  After being asked a couple more questions, Flynn gave the following statement that was nonresponsive to any question posed by O'Neal's counsel:  "I want to step back one second since you raised the issue about the ownership interest, how these companies were started.  [O'Neal] testified yesterday that he started Site Management Solutions.  That own argument would put him in perjury of yesterday.  So how we started the company is an issue that O'Neal and I

56

have ─ it's very delicate and he testified yesterday, so I guess . . . it's an area that is very delicate. But all the rest of the testimony I think we need to be aware of."[14]

Services does not directly contend that Flynn's testimony at the 2003 trial gave Cingular full knowledge of the fraud. Rather, it argues that "*according to Defendants*, Flynn admitted to the alleged fraud involving the SMA and SLA." (Italics added.) Services is referring to the fact that in its 2007 motion for summary judgment, TMO cited Flynn's 2003 testimony as establishing his fraud and conflict of interest, stating: "And, in a lawsuit between Flynn and O'Neal in 2003, Flynn testified that O'Neal had 'perjured himself' by testifying that O'Neal started Solutions himself, maintaining instead that 'we started the company' together." In this appeal, TMO submits that in its 2007 motion for summary judgment, it argued "that Flynn's testimony in [the 2003 trial] was a second *admission* of his conflict of interest. Having just received Flynn's detailed and incriminating 2002 Arbitration testimony in early 2007, Flynn's subsequent testimony in 2003 . . . *was* another admission of his conflict of interest. However, TMO did not argue that Flynn's 2003 testimony provided full knowledge of Flynn's fraud and conflict of interest." TMO further asserts that "[o]nly with Flynn's testimony from the 2002 Arbitration, which TMO obtained just before it moved for summary judgment, could Flynn's [2003 trial] testimony be understood as an admission of Flynn's conflict of interest."

---

[14]    O'Neal's counsel moved to strike Flynn's unsolicited testimony as "nonresponsive to anything." The court denied the motion but admonished Flynn to "just stick to the questions here."

Notwithstanding the spin TMO put on Flynn's 2003 testimony in its zeal to establish Flynn's fraud as an undisputed fact entitling it to summary judgment on the fourth amended complaint, Flynn's testimony was borderline incoherent. Regarding O'Neal's testimony that he (O'Neal) had started Solutions, Flynn cryptically asserted: "That own argument would put him in perjury of yesterday." Flynn did not then testify that "we started [Solutions] company together," as TMO suggested in its 2007 summary judgment motion; he said, "So how we started the company is an issue that O'Neal and I have ─ it's very delicate and he testified yesterday, so I guess . . . it's an area that is very delicate." This testimony is not a clear admission that Flynn owned an interest in Solutions from its beginning. Accordingly, Cingular's counsel who observed the 2003 trial cannot be deemed to have obtained full and actual knowledge of Flynn's fraud and conflict of interest from Flynn's testimony in the trial.[15]

The evidence before the court ruling on the 2007 summary judgment/adjudication motions does not support a reasonable inference that Pacbell's suspicions and "red flags" concerning Flynn and its agreements with Solutions related to the specific fraud at issue – i.e., Flynn's role in creating OCG and Solutions and his ownership interest in them from their inception. The evidence shows that Pacbell's ability to investigate any suspicions

---

[15] Services also notes that in the federal *TCG v. Cingular* action, defendants sued TCG and "claimed that Flynn and his companies were submitting fraudulent billings relating to sham companies created by Flynn." However, that counterclaim does not concern Flynn's fraud and conflict of interest in creating and contracting with Solutions. Cingular's counterclaim alleged that TCG and its principals schemed "to defraud Cingular by deliberately invoicing and collecting monies from Cingular that were not lawfully due and owing to TCG."

was hindered by Flynn's purposeful efforts at concealment and failure to volunteer information that he was under a fiduciary duty to disclose. The evidence does not raise triable issue of fact as to whether TMO and its predecessors had full knowledge of Flynn's actual interest in Solutions before 2007 and, *with that knowledge*, continued to perform under the terms of the original agreements or sought additional concessions or benefits that would clearly manifest an intention to affirm a fraudulently-induced contract. Accordingly, the court properly granted TMO's motion for summary judgment.[16]

E.    *The trial court did not err in denying Services's ex parte application*
      *to supplement the record*

Services contends the court erroneously denied its ex parte application to supplement the record with new evidence that showed Cingular had actual knowledge in 2003 of Flynn's alleged conflict of interest when its former counsel Hess attended the *TCG v. O'Neal* trial and heard Flynn give testimony indicating that he and O'Neal started Solutions together. The new evidence included Hess's time sheet showing she attended the trial and the transcript of her June 18, 2007 deposition, in which she testified that she had no recollection of Flynn's 2003 trial testimony. As noted, Judge Enright denied the application, indicating he did not want to delay the litigation further and no good cause had been shown. We note that although the new evidence that Hess attended the *TCG v.*

---

[16]    In light of plaintiffs' concession at oral argument that there is no triable issue of fact as to Flynn's conflict of interest and fraud, we decline to address Services's argument in its opening brief that there are triable issues of fact as to fraud – in particular, as to whether Flynn was an owner of Solutions when the SMA and SLA were executed.

*O'Neal* trial in April 2003 (Hess's time sheet and deposition transcript) was not before the trial court when it ruled on the 2007 motions for summary judgment and summary adjudication, both Services and TMO incorporate the fact that Hess attended the *TCG v. O'Neal* trial into their arguments on appeal regarding whether the court should have denied TMO's 2007 summary judgment motion on the ground there were triable issues of fact as to whether defendants ratified or waived the right to rescind the SMA and SLA.

We conclude that the trial court did not abuse its discretion in denying Services's application to supplement the record. The record shows Services knew that counsel for Cingular attended the *TCG v. O'Neal* before it brought its July 2007 ex parte application to supplement the summary judgment record and even before the 2007 summary judgment/adjudication motions were filed. In opposition to Services's motion for reconsideration of the 2007 summary judgment order, defendants cited multiple interrogatory responses served in January 2007 in which Services stated its understanding "that representatives of Mitchell Silberg & Krupp and/or Cingular attended judicial proceedings in a declaratory relief action during which these issues [concerning whether Solutions could pursue claims under the SMA despite having assigned rights under the SMA to Services] were discussed." In a memorandum of points and authorities dated May 4, 2007 regarding opposing requests for monetary sanctions, Services stated that it was "undisputed that Cingular's counsel, Stephanie Hess of the Mitchell Silberg law firm, attended the trial in the action entitled *TCG v. O'Neal* . . . , during which Mr. Flynn testified about the [2002] arbitration transcripts and his testimony given in that proceeding." Thus, the evidence that Hess attended the trial was not new. In any event,

60

to the extent the court erred by refusing to consider the evidence presented with Services

ex parte application to supplement the record, the error was not prejudicial because, as we

discussed above, Flynn's testimony at the 2003 *TCG v. O'Neal* trial did not raise triable

issue of fact as to whether TMO and its predecessors had full knowledge of Flynn's actual

interest in Solutions before 2007 and, *with that knowledge*, continued to perform under

the terms of the original agreements or sought additional concessions or benefits that

would clearly manifest an intention to affirm a fraudulently-induced contract.

F.      *The trial court did not err in denying Services's motion for reconsideration
        of the 2007 summary judgment order*

Services contends the court erred in denying its motion for reconsideration, which

was based on the same "recently discovered evidence" of Hess's attendance at the 2003

*TCG v. O'Neal* trial that it sought to present in its unsuccessful ex parte application to

supplement its opposition to defendants' motions for summary judgment.

Under Code of Civil Procedure section 1008, " '[a] motion for reconsideration

must be based on new or different facts, circumstances or law [citation], and facts of

which the party seeking reconsideration was aware at the time of the original ruling are

not "new or different."  [Citation.]  In addition, a party must provide a satisfactory

explanation for failing to offer the evidence in the first instance. [Citation.]'  [Citation.]

'An order denying a motion for reconsideration is interpreted as a determination that the

application does not meet the requirements of section 1008. . . . We review a trial court's

ruling on a motion for reconsideration under the abuse of discretion standard."  (*Gaines v.

Fidelity National Title Ins. Co.* (2013) 222 Cal.App.4th 25, 47.)

61

In its order denying the motion for reconsideration, the court noted the papers submitted on the motion included "discovery responses confirming that in January of 2007, five months prior to the summary judgment hearing, Services believed that representatives of the Mitchell Silberg firm may have attended the [*TCG v. O'Neal*] trial. . . ." The court acknowledged Services's argument that it was not aware of Hess's identity as the attorney who attended the trial "until after the summary judgment motion was filed and that it was not until three days after the first oral argument on the motion that Services was able to depose Ms. Hess." However, the court noted that Services began its efforts to depose Hess weeks before the summary judgment hearing and that despite its expectation that Hess's testimony would confirm her attendance at the *TCG v. O'Neal* trial, Services did not request a continuance of the summary judgment motion before its opposition was due or before the initial oral argument on the motion. Based on the fact that Services was aware of Hess's identity and her expected testimony well in advance of the hearing on the summary judgment motion, the court concluded that Services failed to show that Hess's deposition testimony constituted new facts for purposes of Code of Civil Procedure section 1008.

In accordance with our discussion in the preceding section regarding Service's ex parte application to supplement the summary judgment record, we conclude the trial court correctly ruled that Services's motion for reconsideration was not based on new facts as required by Code of Civil Procedure section 1008. Therefore, the court did not abuse its discretion in denying the motion.

62

G.    *The trial court correctly ruled as a matter of law that the GSMF joint venture was not a colocation agreement within the meaning of the SMA*

In the first cause of action of its fourth amended complaint, Services alleged that defendants violated the SMA by failing to pay Services $400 million it was owed as its share of the rents and cost savings resulting from the GSMF Joint Venture formed by Cingular and Voicestream (later, T-Mobile).  In granting Cingular's and TMO's motions for summary judgment, the trial court ruled that "[t]he Joint Venture is not covered by the SMA's express terms as it does not constitute a [colocation] agreement."[17]  On appeal, Services contends, first, that the trial court's decision violates Code of Civil Procedure section 437c, subdivision (f)(1), which prohibits piecemeal adjudication of causes of action, and second, that there were triable issues as to whether the GSMF Joint Venture was a colocation agreement within the meaning of the SMA.  We conclude there was no error, either procedurally or substantively.

1.    Defendants' motion did not seek improper piecemeal adjudication of Services's claims under the SMA

Services argues that defendants sought, and the trial court improperly granted, piecemeal summary adjudication of the first cause of action, in that defendants'

---

[17]    Having ruled that the SLA and SMA were void (or voidable) and unenforceable because Flynn fraudulently induced them, the court could have deemed moot the contract interpretation issue of whether the GSMF Joint Venture was a colocation agreement within the meaning of the SMA and declined to address that issue.  However, the court exercised its discretion to decide the contract interpretation issue as an additional ground for granting Cingular's motion for summary judgment, and we exercise our discretion to review the court's ruling on the issue.

63

arguments were directed at only one component of Services's claim alleging that defendants breached the SMA, rather than at the entire cause of action. We disagree.

The Code of Civil Procedure authorizes a party to "move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one of more issues of duty. . . .A motion for summary adjudication shall be granted *only if it completely disposes of a cause of action . . . .*" (Code Civ. Proc. § 437c, subd.(f)(1), italics added.) The parties' dispute here turns on the meaning of the phrase "cause of action." In *Lilienthal & Fowler v. Superior Court* (1993) 12 Cal.App.4th 1848 (*Lilienthal*), a legal malpractice action, the court of appeal held that the trial court properly could rule on a summary adjudication motion directed at the claims pertinent to services rendered on one legal matter, which claims had been combined in the same cause of action with the claims arising from services performed on another legal matter. (*Id.* at pp. 1854-1855.) Reviewing an earlier (but not substantively different) version of the statute,[18] the court observed that the term "cause of action" in a broad sense means " '*the invasion of a primary right* (e.g. injury to person, injury to property, etc.). . . . However, in more common usage, "cause of action" means a group of related paragraphs in the complaint reflecting *a separate theory of liability. . . .* [¶] As used in [Code Civ. Proc.] [section] 437c(f), "cause of action" should

---

18    The current version of section 437c, subdivision (f)(1), differs in nonsubstantive ways from the version reviewed in *Lilienthal*. For example, the Legislature changed the order of the wording and added the final sentence expressly stating that the motion must dispose of the entire cause of action or claim for damages. (See Stats. 1993, ch.276 (A.B. 498), § 1, p. 1971.)

be interpreted in the latter sense (theory of liability).' " (*Lilienthal*, *supra*, at p. 1853.) The court determined that the Legislature's intent is best effectuated "by applying the section in a manner which would provide for the determination on the merits of summary adjudication motions involving *separate and distinct wrongful acts* which are combined in the same cause of action."[19] (*Id*. at p. 1854, italics added.) In *Lilienthal*, defendants' motion was proper because plaintiffs sought "to recover damages based on two separate and distinct obligations" having "no relation to each other and involv[ing] legal services performed at different times, with different and distinct obligations, and distinct and separate alleged damages." (*Ibid*.)

The same reasoning applies here. Services alleged that defendants violated the SMA in various ways. In a separate section of the "Preliminary Allegations" portion of the fourth amended complaint, under the heading reading, in part, "Defendants Owe Services In Excess of $400 Million for Rent and Cost Savings," Services alleged the factual basis for its assertion that the GSMF Joint Venture (or what Services calls the "Voicestream Agreement") was a colocation agreement within the meaning of the SMA and that, pursuant to the SMA, Services was entitled to a share of the cost savings and

---

[19]     Many other courts have reached a similar conclusion. (See, e.g., *Mann v. Quality Old Time Service, Inc*. (2004) 120 Cal.App.4th 90, 106 [party can move for summary adjudication of any distinct claim within a cause of action]; *Edward Fineman Co. v. Superior Court* (1998) 66 Cal.App.4th 1110, 1118 ["a party may present a motion for summary adjudication challenging a separate and distinct wrongful act even though combined with other wrongful acts alleged in the same cause of action"]; *Exxon Corp. v. Superior Court* (1997) 51 Cal.App.4th 1672, 1688, fn. 11 [Exxon was "entitled to present summary adjudication motions that dispose of allegations which would have formed a single cause of action if properly pleaded"].)

rents generated by that Joint Venture. As Services itself acknowledges, elsewhere in the fourth amended complaint, and under different headings, Services alleged the factual basis for other claimed violations of the SMA *and the different damages owed for each*, including "that Defendants owed management fees that were unrelated to the fees owed in connection with the Voicestream Agreement, that Defendants had breached the SMA by failing to advise Services of colocation opportunities and not allowing Services to negotiate colocation agreements with other carriers, and that Defendants breached the SMA by failing to ensure that assignees of the SMA had complied with their obligations." In its first cause of action, Services generally alleged that defendants violated the SMA in all the foregoing respects.

The only common thread among these allegations is that they purport to set forth defendants' breaches of the SMA.[20] Services's own description of these claims and the structure of the fourth amended complaint demonstrate they are separate and independent breaches of the same instrument, each based on a separate theory of liability (or breach), and each giving rise to distinct claims for damages. Accordingly, each is a "separate and

---

[20] The various breaches of the SMA alleged by Services also all purportedly involve the GSMF Joint Venture, but in different ways. The particular issue considered by the trial court on summary judgment was whether the agreements by which the GSMF Joint Venture was formed and funded themselves created the type of "colocation" arrangement contemplated by the SMA. The other alleged breaches concerned sites that were excluded from the GSMF Joint Venture because they had been assigned by Cingular to a third party (SpectraSite, and then later, CA/NV Tower Holdings, LLC). Those entities then allegedly entered in colocation agreements for those sites with the GSMF Joint Venture, among others. With respect to these latter agreements, Services alleged Cingular was obligated to ensure that the third party complied with the terms of the SMA as it impacted Services.

66

distinct wrongful act" (*Lilienthal*, *supra*, 12 Cal.App.4th at p. 1854) that may be adjudicated separately without running afoul of the principal purpose underlying the statute─" 'to stop the practice of adjudication of *facts* or adjudication of *issues* that do not completely dispose of a cause of action or a defense.' " (*Id*. at p. 1853.)

*Decastro W. Chodorow & Burns v. Superior Court* (1996) 47 Cal.App.4th 410 (*Decastro*), cited by Services, does not compel a different conclusion. At issue in that case was whether summary adjudication could be granted as to only one component of plaintiffs' alleged legal malpractice damages, namely "lost opportunity" damages. Unlike *Lilienthal*, however, the *Decastro* action involved a legal malpractice claim arising from a single matter, and defendants sought summary adjudication as to only one item of their compensatory damages arising from that incident. (*Id*. at pp. 415-416.) The *Decastro* court distinguished *Lilienthal* on that basis. (*Decastro, supra*, at pp. 421-422.) Contrary to Services' contention, defendants here did not challenge one component of damages arising from a single alleged wrongful act. Rather, they challenged a breach of contract claim based on one of several allegedly wrongful acts, each of which was alleged to be a breach of the SMA, and each of which gave rise to an independent claim for damages.

We conclude defendants properly sought summary adjudication of the breach of contract claim based on Services's allegations that the GSMF Joint Venture agreement was a colocation agreement within the meaning of the SMA, and the trial court did not err in summarily adjudicating that claim.

67

2. Legal standards applicable to interpreting the SMA

"The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264 (*Bank of the West*); *Parsons v. Bristol Development Co*. (1965) 62 Cal.2d 861, 865.) " 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citations.]" (*State of California v. Continental Insurance Co*. (2012) 55 Cal.4th 186, 195 (*State of California*).) If contractual language is clear and explicit, and does not involve an absurdity, it governs. (Civ. Code, § 1638; see *State of California*, *supra*, 55 Cal.4th at p. 195.)

Contract interpretation is solely a judicial function "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or when a determination was made based on incompetent evidence." (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 (*City of Hope*); see also *Home Federal Savings & Loan Assn. v. Ramos* (1991) 229 Cal.App.3d 1609, 1613 [where parties presented little or no conflicting extrinsic evidence, "the trial court properly refused to submit the interpretation of the written guaranty to the jury"].) A jury may interpret an agreement when a contractual provision is ambiguous and determining the intent of the parties depends on "the credibility of extrinsic evidence." (*City of Hope*, *supra*, at p. 395.) "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (*Waller v. Truck Ins. Exchange, Inc., supra*, 11 Cal.4th at p. 18.) A contract is not ambiguous, however, merely because the parties disagree on the meaning of a phrase, or because " ' "a word or

68

phrase isolated from its context is susceptible of more than one meaning." '  [Citation.]"
(*State of California*, *supra*, 55 Cal.4th at p. 195.)  Rather, the "language in a contract
must be construed in the context of that instrument as a whole, and in the circumstances
of that case, and cannot be found to be ambiguous in the abstract."  (*Bank of the West*,
*supra*, 2 Cal.4th at p. 1265, italics omitted.)  The trial court may resort to extrinsic
evidence to determine the parties' intent only where it is " 'relevant to prove a meaning to
which the language is "reasonably susceptible." ' "  (*PV Little Italy, LLC v. MetroWork
Condominium Assn.* (2012) 210 Cal.App.4th 132, 156 (*PV Little Italy, LLC*), citing *Winet
v. Price* (1992) 4 Cal.App.4th 1159, 1165 (*Winet*).)

Our review of the trial court's interpretation of the contract is de novo if the
contract's meaning can be determined from the language alone, or when the extrinsic
evidence, if any, is not in conflict.  (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 417, fn. 7;
*Winet*, *supra*, 4 Cal.App.4th at pp. 1165-1166; *PV Little Italy, LLC*, *supra*, 210
Cal.App.4th at pp. 144-145 [appellate court independently interprets the meaning of an
instrument if the trial court's interpretation does not turn on the credibility of extrinsic
evidence].)

3.      Meaning of the term "colocation agreement" in the SMA

The SMA provided that Solutions (and later, by alleged assignment, Services)
would be Pacbell's "sole and exclusive representative to sublease, license and manage
Sites for use by Other Carriers for mobile/wireless telecommunications purposes and, in
that regard, [Pacbell] shall refer all Other Carriers with offers or inquiries regarding the

69

use of Sites for the placement of an Other Carrier's Facilities to [Solutions]."[21]  In return

for performing various colocation services with respect to these sites, Solutions was to

receive for each colocation agreement entered into with another carrier certain designated

management fees, as well as a share of monies collected from other carriers under "cost

sharing arrangements" included within colocation agreements.

The parties' dispute over the proper interpretation of the SMA focuses on what the

parties meant by "colocation agreement."  That term is defined in Recital B of the SMA,

as follows:

> "[Pacbell] has entered into, or will enter into, certain colocation
> agreements or cost sharing agreements for the shared use or
> codevelopment of common facilities (each a 'Colocation
> Agreement') with other mobile/wireless communications companies
> (each an 'Other Carrier') whereby [Pacbell] is subleasing or
> sublicensing space on its tower, and in some cases space on the
> ground, and/or the use of [Pacbell's] facilities for the Other Carrier to
> place its communications facilities ('Other Carrier's Facilities')."

Cingular asserts that the language following the word "whereby" in this provision

makes clear that a colocation agreement entitling Services to any monies is *only* one in

which another carrier has subleased or sublicensed space on Pacbell's facilities in order to

---

[21]    Services alleged that Solutions assigned certain of its rights under the SMA to
Services as part of the 2002 Flynn/O'Neal Settlement, and that defendants acknowledged
that assignment.  In the trial court, Cingular challenged Services's standing to pursue
claims under the SMA when it moved for summary adjudication on its claim for
declaratory relief in its cross-complaint, but the standing challenge was mooted by the
trial court's ruling on the fraud issue.  On appeal, defendants refer to the 2002 transaction
as the "alleged" assignment, but do not argue specifically that Services lacks standing to
seek relief under the SMA.  Therefore, we assume for purposes of this appeal that
Services has standing to enforce the rights specified in the SMA and alleged in its fourth
amended complaint.

physically place its own wireless communications equipment there.  Services, on the other hand, contends that *any* "cost sharing agreements for the shared use or codevelopment of common facilities" entitles Services to payments under the SMA, regardless of whether the other carrier has subleased or sublicensed space on Pacbell sites for the placement its own equipment.  We conclude Cingular is correct.

We first examine the disputed language of the contract to determine whether the parties' intent may be gleaned solely from the words used.  (*State of California*, *supra*, 55 Cal.4th at p. 195.)  The thrust of Services's argument is that the placement of the phrase "(each a 'Colocation Agreement')" directly after the words "[Pacbell] has entered into, or will enter into, certain colocation agreements or cost sharing agreements for the shared use or codevelopment of common facilities," means that the definition of "Colocation Agreement" is limited to what *precedes* the parenthetical, suggesting the "whereby" clause that follows the parenthetical is irrelevant to determining what is or is not a colocation agreement.  We reject this construction.

First, a fundamental tenet of contract interpretation is that "[t]he whole of the contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."  (Civ. Code, § 1641.)  "The rule's effect, among other things, is to disfavor constructions of contractual provisions that would render other provisions surplusage."  (*Boghos v. Certain Underwriters at Lloyd's of London* (2005) 36 Cal.4th 495, 503; see *Advanced Network, Inc. v. Peerless Insurance Co*. (2010) 190 Cal.App.4th 1054, 1063 (*Advanced Network, Inc*.) [" 'We must give significance to every word of a contract, when possible, and avoid an interpretation that

71

renders a word surplusage.' "].) Services's interpretation would require us to read an entire clause out of the SMA, which we may not do. Services fails to explain why the parties would include the "whereby" clause in the contract if it was to have no relevance at all to the definition of colocation agreement.[22]

Second, although, as Services notes, it may be common for contracting parties to set forth the definition of a term, followed by a short form of that term in parentheses and quotation marks, it cites no authority or rule that a particular term in a contract may be defined *only* by what precedes it, and not by what follows it. In fact, what immediately follows the first parenthetical in Recital B is "with other mobile/wireless communications companies (each an 'Other Carrier')," which is inherently part of the definition of colocation agreement, since an agreement involves at least two parties. Services does not contend otherwise. In this case, Recital B contains a number of defined terms, and the parties may have placed the parenthetical "(each a Colocation Agreement)" where they did simply to avoid crowding several defined terms together in one sentence.

Services erroneously relies on *Board of Port Commissioners v. Williams* (1937) 9 Cal.2d 381, as support for its assertion that "[l]anguage following a specifically defined term . . . cannot be used to modify the term." That is not, however, what the California

---

22    We also reject Services's argument in its reply brief that we should ignore the "whereby" clause in Recital B because "[r]ecitals only reflect the background of a contract," and "do not have the force of contractual stipulations." Of course, Services itself acknowledges that Recital B contains the controlling definition of "colocation agreement." It cites no authority that would allow it to pick and choose which terms within Recital B (which consists of a single sentence) have significance and which do not.

Supreme Court held in that case. Rather, in construing how a particular phrase modified other language in a statute, the court applied the so-called "last antecedent rule," which generally provides that " 'qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote.' " (*Id.* at p. 389; see *Costco Wholesale Corp. v. Workers' Comp. Appeals Bd.* (2007) 151 Cal.App.4th 148, 153 (*Costco*) [setting forth rule].) The rule applies to the construction of both statutes and contracts. (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co*. (2003) 107 Cal.App.4th 516, 529.) However, a number of courts have cautioned that the rule " 'is not immutable' and should not be 'rigidly applied' in all cases." (*Id.* at p. 530.) All rules of construction " 'are but tools, "guides to help courts determine likely legislative [or contractual] intent. [Citations.] And that intent is critical. Those who write statutes [and contracts] seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute [or contract]." ' " (*Costco, supra,* at pp. 153-154, quoting *Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017; accord, *Orthopedic Systems, Inc. v. Schlein* (2012) 202 Cal.App.4th 529, 545-546.) To the extent we apply the "last antecedent rule" here, we do so not reflexively, but in a reasonable manner that gives meaning to all the terms of the parties' agreement, if reasonably possible, and with a view to discerning the parties' true intent.

Recital B is a long sentence comprised of several conjunctives and disjunctives, a number of commas, and three defined terms. The first half of the sentence ending with

73

"(each an 'Other Carrier')," refers disjunctively to two different types of instruments: colocation agreements and cost sharing agreements. (See, e.g., *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 (*White*) ["use of the word 'or' . . . indicates an intention to use it disjunctively so as to designate alternative or separate categories].) The use of the word "each" in the parenthetical indicates the parties' intent that, for purposes of the SMA, the defined term "colocation agreement" includes both types of agreements, and *suggests* these are two different kinds of agreements. Put another way, if all colocation agreements necessarily must provide for the colocation of another carrier's equipment, as defendants insist they must, arguably there would appear to be no reason to specifically include *both* colocation agreements (which inherently involve the placement of one carrier's equipment on another's sites) *and* cost sharing agreements within the definition. (See *Advanced Network, Inc.*, *supra*, 190 Cal.App.4th at p. 1063 [" 'We must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage.' "].)[23]  Furthermore, there appears to be no dispute that the modifying phrase "for the shared used or codevelopment of common

_____

[23]     Cingular cites section 5, subdivision (c) of the SMA, which specifies that Solutions was to be compensated with a portion of payments made "under cost sharing arrangements in Colocation Agreements and any one-time cost sharing for codevelopment due under any Colocation Agreement." Based on this language, Cingular argues that cost sharing compensation under the SMA was allowed only "*if* it was *also pursuant* to a colocation agreement." That is not what this provision says. It specifies the compensation derived from cost sharing arrangements in "Colocation Agreements" (i.e., the capitalized defined term, which separately includes cost sharing agreements), not "colocation agreements," (the uncapitalized, undefined term, which is just one form of "Colocation Agreement" under the SMA.) Accordingly, this provision does not in itself compel the conclusion that a cost sharing agreement must also include an agreement for the physical placement of another carrier's equipment on Pacbell's sites.

facilities" applies equally to both colocation agreements and cost sharing agreements. (See *White, supra,* 31 Cal.3d. at pp. 680-681 [" ' "[when] several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." ' "].)

If we were to end our analysis here, we might well conclude that the parties intended the defined term "colocation agreements" to include two different types of agreements (colocation and cost sharing agreements) and that, as Services contends, a colocation agreement need not necessarily be one that includes the physical placement of another carrier's equipment on Pacbell's sites. However, as noted, we must consider *all* the language of Recital B, so we now turn to the principal disputed language in Recital B, the "whereby" clause, to determine whether and how that language impacts the interpretation of the defined term, "Colocation Agreement."

That portion of Recital B reads: " . . . whereby [Pacbell] is subleasing or sublicensing space on its tower, and in some cases space on the ground, and/or the use of [Pacbell's] facilities for the Other Carrier to place its communications facilities ('Other Carrier's Facilities')." We observe first that there is no comma between the parenthetical containing the defined term "(each an 'Other Carrier')" and the "whereby" clause. A strict application of the last antecedent rule would have us apply the "whereby" clause only to that defined term and the immediately preceding phrase, "with other mobile/wireless communications companies." (See *White*, *supra*, 31 Cal.3d at p. 680 ["Evidence that a qualifying phrase is supposed to apply to all antecedents instead of only to the immediately preceding one may be found in the fact that it is separated from the

75

antecedents by a comma.".)  But in this instance, such an application would make no sense.  The "whereby" clause on its face does not modify the type of companies involved in colocation agreements, but the nature of those agreements.  Accordingly, we conclude that the "whereby" clause, contrary to Services's argument, was intended to further qualify what types of colocation agreements were contemplated by the SMA.

The final interpretive question is precisely *how* the "whereby" clause modifies colocation agreement.  Because there is no comma between the phrase "and/or the use of [Pacbell's] facilities" and the qualifier "for the Other Carrier to place its communications facilities," the last antecedent rule would have us apply that final qualifier only to the immediately preceding phrase (*White*, *supra*, 31 Cal.3d at p. 680), resulting in the following interpretation:  A colocation agreement involves either (a) the subleasing or sublicensing of space on Pacbell towers or ground, or (b) the subleasing or sublicensing of the use of Pacbell facilities for the placement of another carrier's equipment.  Under this interpretation, a cost sharing agreement conceivably could be a colocation agreement if it involves the subleasing or sublicensing of space from Pacbell, but it does not necessarily have to involve the physical placement of the other carrier's communications facilities on a Pacbell site.  This interpretation seems strained, however, because it is unlikely another carrier would sublease or sublicense *space* on Pacbell's towers or ground unless it was for the purpose of placing its own equipment there.

Reading Recital B in its entirety, as we must, we conclude the only reasonable interpretation is that a colocation agreement is an agreement between Pacbell and another carrier (1) for the shared use or codevelopment of wireless facilities (2) that involves

76

Pacbell's subleasing or sublicensing of space on a Pacbell tower or ground, and/or the use of Pacbell wireless facilities, (3) for the purpose of allowing the other carrier to place its own equipment. This interpretation gives effect to the specific reference to cost sharing agreements as one type of covered agreement, in that it contemplates agreements that may be principally cost sharing in nature but brings such agreements within the SMA only if they have a colocation component.

We acknowledge that Recital B is not a model of clarity, particularly given the placement of commas, the use of the term "and/or," and the fact that cost sharing agreements are separately included as colocation agreements. No other interpretation, however, gives substance to each of the provisions terms. We note that other provisions in the SMA support our interpretation. For example, section 3 of the SMA sets forth the colocation services Solutions was to perform under the agreement. It states that Solutions "shall be [Pacbell's] sole and exclusive representative to sublease, license and manage Sites for use by Other Carriers for mobile/wireless telecommunications purposes and, in that regard, [Pacbell] shall refer all Other Carriers with offers or inquiries *regarding the use of Sites for the placement of an Other Carrier's Facilities* to Manager." (Italics added.) Additionally, the services Solutions was to provide included "[r]eceiv[ing] proposed plans and specifications from Other Carriers for the installation and maintenance of the Other Carrier's Facilities."

Similarly, the SMA provides that Pacbell would have the "right to approve in its sole discretion (i) all Colocation Agreements; (ii) the specific location of Other Carrier's Facilities; and (iii) to the extent provided in the Colocation Agreement, the plans and

77

specifications for the construction, installation or modification of the Other Carrier's Facilities or common facilities." The SMA also called for each party to "cooperate to effectuate the purposes of this Agreement," including requiring Pacbell to "provide to [Solutions] and Other Carriers interested in locating facilities on a Site reasonable access to the Site to facilitate the performance of Colocation Services." This language supports defendants' interpretation, as it strongly indicates the principal focus of colocation agreements, as defined in the SMA, is to allow other carriers to colocate their wireless communications facilities on Pacbell sites.

Because we are able to interpret the definition of colocation agreement based on the SMA's language alone, we need not examine the parties' extrinsic evidence. (See, e.g., *City of Hope, supra*, 43 Cal.4th at p. 395.) We observe, however, that the extrinsic evidence the parties cite is not particularly useful. In particular, O'Neal's testimony (cited by Cingular) regarding his subjective understanding of the SMA as a signatory to the agreement is irrelevant. "California recognizes the objective theory of contracts [citation], under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.' [Citation.]" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc*. (2003) 109 Cal.App.4th 944, 956.).

As additional extrinsic evidence, Cingular points to the fact that Services never claimed prior to this lawsuit that the particular cost sharing agreement at issue, the GSMF Joint Venture, was a colocation agreement under the SMA, even though it sought to collect other payments it believed it was entitled to receive under that agreement. This

78

could be somewhat probative because it suggests that if Services in fact believed it was entitled to payment as a result of the GSMF Joint Venture, especially in the amount of $400 million, it would have asserted that at the same time it sought other outstanding payments under the SMA. On the other hand, Services was under no legal compulsion to ever assert any claim it might have under the SMA, and defendants identify no evidence that Flynn knew all the details of the structure of the GSMF Joint Venture when it was formed, which could explain a delay in asserting Services's rights, if any, under the Joint Venture.

The only extrinsic evidence relied on by Services consists of a number of agreements Services contends Pacbell entered into with other carriers that "provided for the payment of fees to Services in connection with cost sharing agreements which did not involve 'the placement of another carrier's equipment' on [Pacbell] sites." These agreements arose because Pacbell and another wireless carrier had entered into separate agreements to lease premises from the same landlord for the construction and operation of a communications facility. To provide for an equitable sharing of costs incurred with the installation and maintenance of so-called "common facilities," Pacbell and the other carrier entered into these cost sharing agreements. The term "common facilities" was generally defined in these agreements as "equipment, facilities, structures and improvements located on Landlord's Property which both [Pacbell] and the [the other carrier] will use or benefit from, such as, but not limited to, access roads, screening, conduits and similar facilities." Under these agreements, Cingular generally was responsible for installing, maintaining and repairing the common facilities, and the other

79

parties were granted the right to use these common facilities for the term of the agreement, in exchange for paying their percentage share of the shared costs to Pacbell's designated payee. Solutions was named in the agreements as the "payee" to whom the licensees would remit their payments under these agreements.

These agreements do not heavily favor one interpretation of Recital B or the other. Various provisions in these agreements anticipate the other wireless carrier would perform "construction activities" pursuant to its own agreement with the landlord, and install its own property "within the common facilities." However, nothing in these agreements required the placement of wireless communications equipment on Pacbell sites. Notably, these agreements were entitled "Cost sharing Agreement," rather than "Colocation Agreement," as one might reasonably expect they would be if they were intended as such within the meaning of the SMA. Additionally, the SMA gave Pacbell the authority "to engage [Solutions], or [Solutions's] affiliates, to provide other services outside the scope of [the SMA]." Thus, contrary to Services's contention, any payments to which Solutions (and later, Services) may have been entitled under these cost sharing agreements might well have been authorized not by the SMA itself, but by virtue of a separate engagement by Pacbell. Services points us to no evidence that any fees it received under these agreements were actually paid pursuant to the SMA, or calculated according to the formulas set forth in the SMA (which might be indirect evidence that the cost sharing agreements were covered by the SMA). Absent some explanation from the parties regarding the circumstances surrounding the making of these cost sharing agreements and how the parties operated under them, these agreements, either standing

alone or viewed in the context of the larger record, do not compel us to adopt either party's proffered interpretation of the meaning of "colocation agreement."

Although the extrinsic evidence specifically relied on by the parties does not, in our view, conclusively favor either party's interpretation, we note that there are other documents in the 2007 summary judgment record, not cited by either party, that provide some objective (and apparently, undisputed) evidence of what the parties intended by the term "Colocation Agreement." These documents, unlike the cost sharing agreements referenced by Services, are entitled "Colocation Sublease Agreement," or something similar , and generally provide that another carrier will sublease space on a Pacbell tower or site for the construction and installation of its *own* facilities (such as antenna arrays or other equipment), in exchange for a rental payment. Some of these agreements include cost sharing provisions. Solutions was the designated payee for rental payments. In our view, these agreements most consistently track the language of Recital B of the SMA, as we have interpreted it here. They all provide for the placement of the other carrier's equipment on Pacbell sites, but they also demonstrate that colocation agreements can have a cost sharing component.

4.     The GSMF Joint Venture was not a colocation agreement

We now turn to the issue of whether the GSMF Joint Venture was a colocation agreement within the meaning of the SMA. We conclude it was not. Even if Recital B did not require the physical placement of another carrier's equipment on a Pacbell site, the GSMF Joint Venture was not a colocation agreement because it did not meet the first

81

prong of the "whereby" clause; specifically, it was not an agreement whereby another carrier *subleased or sublicensed* space or the use of facilities *from Pacbell*.

The GSMF Joint Venture was structured very differently from a colocation agreement contemplated by the SMA. The Joint Venture's purpose was to enable Cingular's customers to use T-Mobile's existing New York network and T-Mobile's customers to use Cingular's existing networks in California and Nevada without each provider having to build a new network in the other's locations or place their own equipment on the other's sites. This was accomplished through Cingular's and T-Mobile's contribution to a new entity, the GSMF Joint Venture, of their respective existing wireless communication network structures in those geographic regions. The GSMF Joint Venture was the holding company for the contributed assets ─ Pacbell from Cingular, and Omnipoint Facilities Network (OFN) from T-Mobil ─ and acted exclusively as an infrastructure provider. It *sold* network services to T-Mobile and Cingular, and the amounts charged to each were based on the monthly operating expenses of the Joint Venture, which were allocated among Cingular and T-Mobile based on their spectrum ownership.

The GSMF Joint Venture did not own, hold or control any licenses. Instead, Cingular and T-Mobile continued to hold the licenses to their wireless communications spectrum outside of GSMF. Through newly-formed subsidiaries, Cingular and T-Mobile each owned 50 percent of the voting interests in GSMF. The Joint Venture was implemented through a series of agreements pursuant to which, among other things, Cingular and T-Mobile each made capital contributions to the Joint Venture, and each

82

was made responsible for providing operational, maintenance, construction, repair and other technical services to its respective systems.

Thus, the GSMF Joint Venture did not entail the placement of another carrier's equipment on Pacbell sites. It also did not involve Pacbell "subleasing or sublicensing [to another carrier] space on its tower, [or] . . . space on the ground, and/or the use of its facilities." Services does not contend otherwise. Rather, Services's principal contention is that the GSMF Joint Venture was a cost sharing and codevelopment arrangement, and that alone is sufficient to bring it within the SMA. We concluded otherwise in our earlier analysis of Recital B of the SMA. Services alternatively argues that T-Mobile and Cingular "jointly owned" the shared networks, made capital contributions for the expansion and codevelopment of the networks, and each took a depreciation expense on the cost of equipment purchased for the other's sites that were part of the Joint Venture. Cingular disputes Services's characterization of the depreciation expense. In our view, the details of the parties' complex accounting techniques are beside the point. We have determined that a colocation agreement can only be one whereby Pacbell *sublicenses or subleases* space on its site or the use of its facilities to another carrier. Services makes no argument that Pacbell or Cingular subleased or sublicensed space on its sites or the use of its facilities to OFN, T-Mobile, or any other entity. To the extent T-Mobile contributed network equipment to the GSMF Joint Venture that it "owned," Services makes no argument, and provided no evidence, that any such contribution was by way of a *sublicense or sublease* of space or facilities from Pacbell or Cingular, let alone that the purpose of any such contribution was to enable T-Mobile to physically place its own

83

wireless communications equipment (such as an antenna) on any Pacbell tower or site, or that T-Mobile paid rent or licensing fees to Pacbell or Cingular in exchange for the use of its sites pursuant to the Joint Venture.

Accordingly, Services's attempt to shoehorn the GSMF Joint Venture into the definition of "colocation agreement" in the SMA is unavailing. The trial court correctly ruled that the GSMF Joint Venture was not a colocation agreement within the meaning of the SMA.

## II.

### *The Trial Court Properly Sustained the 2009 Demurrer to Services's Fraud Claim in its Cross-Complaint*

Services contends that if we reverse that 2007 order granting TMO's motion for summary judgment, we must also reverse Judge Lewis's January 2009 order sustaining, without leave to amend, defendants' demurrer to the first cause of action for fraud in Services's cross-complaint. Because we are affirming the 2007 summary judgment order, we need not address Services's challenge to the 2009 demurrer order.[24]

---

24    Cingular filed a request for judicial notice of a December 14, 2000 letter from Pacbell to Solutions containing certain representations that formed the basis for the fraud cause of action in Services's cross-complaint. We deny the request for judicial notice because the letter is unnecessary to our resolution of the issues raised in this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

## III.

*The Trial Court Properly Granted Summary Judgment
on Flynn's Cross-Complaint for Fraud*

In June 2007, TMO filed its first amended cross-complaint, alleging causes of action against Flynn for fraud by misrepresentation or concealment, breach of fiduciary duty, and constructive fraud. Cingular has asserted no claims against Flynn in this lawsuit. Nevertheless, in response to TMO's cross-complaint, Flynn filed a cross-complaint against Cingular in November 2007 for breach of the 2004 *TCG v. Cingular* settlement agreement, in which Cingular released all claims it may have had against Flynn. In his cross-complaint, Flynn alleged that the settlement agreement was binding on Cingular's subsidiaries, which at that time included Pacbell. He further alleged that in 2005, T-Mobile acquired Pacbell from Cingular and renamed it TMO. Flynn in essence contends that Cingular breached its obligations under the *TCG v. Cingular* settlement agreement by failing to prevent its former subsidiary, Pacbell, from suing Flynn once Pacbell became TMO.

Cingular moved for summary judgment on Flynn's cross-complaint, contending, among other things, that even if Pacbell was bound by the *TCG v. Cingular* settlement agreement (which Cingular disputed), there was no evidence that Cingular had any ability to control Pacbell at the time TMO's cross-complaint was filed, and thus Cingular could not be held liable for breaching, or preventing Pacbell's breach of, the settlement agreement. The trial court agreed, and granted summary judgment in favor of Cingular on Flynn's cross-complaint. We conclude the court ruled correctly.

85

Flynn's attempts to demonstrate issues of fact as to whether Pacbell was bound by the *TCG v. Cingular* settlement agreement are beside the point. According to Flynn's own allegations, in 2005 T-Mobile acquired Pacbell, which thereafter became TMO. It was TMO, not Cingular, that filed cross-claims against Flynn for fraud. As the trial court concluded, Flynn alleged no facts in his cross-complaint, and produced no evidence in response to Cingular's summary judgment motion, that Cingular had any ability to exert control over Pacbell after its acquisition by T-Mobile such that it could be held liable for TMO's decision to assert fraud claims against Flynn. Flynn does not dispute this on appeal. The trial court properly granted summary judgment in favor Cingular on Flynn's cross-complaint.

## TMO'S APPEAL

## I.

### *There Is Insufficient Evidence to Support the Jury's Findings of Ratification and Waiver*

As we discussed in connection with the 2007 summary judgment order, a finding of ratification or waiver of fraud, requires *clear and convincing evidence* that the defrauded party had actual and full knowledge of the fraud; mere inquiry notice is not enough. (*Oakland Raiders, supra,* 144 Cal.App.4th at pp. 1192-1193; *Eichelberger v. Mills Land & Water Co., supra,* 9 Cal.App. at pp. 637-638; *Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 31.) However, as we discuss below, the court gave the jury an erroneous instruction that allowed it to find TMO ratified and waived the right to rescind the subject contracts based on a finding that TMO's predecessor Pacbell

86

was on *inquiry notice* of Flynn's conflict of interest and fraud. Applying the correct full-knowledge standard, we conclude there was insufficient evidence to support a finding *by clear and convincing evidence* that TMO and its predecessors had *full* knowledge of Flynn's fraud before 2007 and, with that knowledge, unequivocally indicated the intention to stand on the fraudulently procured agreements.

The clear and convincing standard requires a finding of high probability. (*Shale Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 891.) To meet that standard, the evidence must so clear as to leave no substantial doubt – i.e., it must be " ' "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " (*Ibid.*) In reviewing the sufficiency of the evidence "we are bound to 'consider the evidence in the light most favorable to the prevailing party, giving [that party] the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citation.] But since the jury's findings were subject to a heightened burden of proof, we must review the record in support of these findings in light of that burden. In other words, we must inquire whether the record contains 'substantial evidence to support a determination by clear and convincing evidence . . . .' " (*Ibid.*, italics omitted.)

The evidence presented at trial on the issue of waiver or ratification was largely the same evidence presented in support of and opposition to TMO's successful 2007 summary judgment motion, with additional witness testimony about that evidence. Regarding Pacbell's 1999 investigation, King testified at trial, as he did in his deposition, that at the time of the investigation he was concerned "that there might be some potential conflicts of interest . . . with [Flynn] and his relationships." In particular, he was

87

concerned about a conflict of interest between Flynn and O'Neal based on their close relationship.

Plaintiffs again argue that a trier of fact could infer ratification or waiver from the facts that the 1999 investigators did not ask questions about the SLA and SMA even though Flynn signed those agreements; the agreements were one-sided and served no legitimate business purpose; King sent a written statement to the investigators emphasizing the benefits of the agreements and did not mention his concerns about Flynn's conflict of interest; and one day after Flynn was interviewed by the investigators, King recommended he receive an ad hoc bonus. Plaintiffs also cite Flynn's trial testimony that King told him to answer the questions he was asked when interviewed by the investigators. However, it is not reasonable to infer ratification or waiver from these facts absent evidence that Pacbell management had full knowledge of Flynn's fraud (i.e., his interest in Solutions) when they occurred.

Regarding the April 2000 meeting, plaintiffs assert that Pacbell did not object when Flynn appeared at Pacbell as Solutions's (or OCG's) owner but instead "elected to ratify, amend, perform, and accept the benefits of the agreements for the ensuing seven years." However, the fact that Pacbell management did not object to Flynn's attending the meeting on behalf of OCG and continued to perform the subject agreements is not evidence that defendants then had actual knowledge that Flynn had an ownership interest in Solutions before he left Pacbell.

Plaintiffs cite no additional facts adduced at trial regarding the events of November 2000 that show defendants had full knowledge of Flynn's fraud and conflict of

88

interest. As in his deposition testimony that was before Judge Enright in ruling on TMO's 2007 summary judgment motion, Flynn testified at trial that Schlecht accused him of having a conflict of interest that rendered the SMA void "because of my lack of signing authority with executing [the SMA]." Additionally, plaintiffs cite the evidence that SBC's in-house counsel Quist advised Pacbell's in-house counsel Jimenez to challenge the validity of the agreements (based on Flynn's lack of signing authority); Pacbell threatened to bring "burdensome litigation" against Solutions and Flynn; Flynn's signing the SMA on behalf of Pacbell and then becoming an employee or principal of TCG and Solutions was "a cause of concern;" Schlecht asserted in a letter to O'Neal that it was "entirely appropriate for [SBC/Pacbell] to raise questions about the validity of the [SMA]" because after Flynn signed the agreement on behalf of Pacbell and left Pacbell he claimed the agreement created "an obligation to [Pacbell] of $4 million;" and Pacbell and SBC assured SpectraSite that "SBC intends to either (i) terminate the purported [SMA] and negotiate a settlement with [Solutions] or (ii) obtain a final judicial or arbitral determination of either the invalidity of the [SMA] or of SBC's liability thereunder." Plaintiffs reiterate that Pacbell/Cingular ratified the Solutions agreements by, among other conduct, continuing to perform the agreements and signing amendments to them in which they expressly "ratified and affirmed" them. As we observed in connection with TMO's 2007 summary judgment motion, this evidence shows that Pacbell questioned the validity of the Solutions agreements based on suspicions and "red flags" concerning Flynn's authority to sign them on behalf of Pacbell, but does not raise a reasonable

89

inference that Pacbell actually knew Flynn had an ownership interest in Solutions when he signed the agreements on behalf of Pacbell.

Plaintiffs argue that a trier of fact could infer waiver in 2002 from Flynn's trial testimony that during a conversation in Las Vegas that, according to plaintiffs, "coincided with [Pacbell's] March 2002 investigation of Flynn's fraud," Cumbie expressed anger at Flynn and called him a "crook" in front of his wife. When Services's counsel asked Flynn what Cumbie meant by calling him a crook, Flynn stated, "He felt that what I had done with O'Neal . . . was wrong." When asked what Cumbie was specifically referencing, Flynn testified, "He basically knew that I had been involved in the company from the start." Flynn was not asked how he knew that Cumbie possessed that knowledge. However, when he was questioned further on cross-examination about this conversation with Cumbie, which counsel noted "you are telling us about now for the first time this afternoon[,]" Flynn acknowledged, "I can't speculate for Mr. Cumbie."

Flynn's unfounded testimony that in 2002, Cumbie knew Flynn had been "involved in the company from the start" is not substantial evidence that Cumbie or anyone else at Pacbell had actual knowledge in 2002 of Flynn's ownership interest in Solutions. Bearing in mind that waiver must be proved by clear and convincing evidence, we observe that saying Cumbie knew Flynn was "involved in the company" (i.e., OCG or Solutions) is not equivalent to saying Cumbie knew Flynn had an *ownership interest* in the company. It was undisputed that Flynn had a close friendship with O'Neal and was *involved* with Solutions as the representative of Pacbell who signed the SMA on behalf of Pacbell. Even viewing Flynn's trial testimony about Cumbie's

90

conversation as credible, despite the fact his deposition testimony about the same conversation included no reference to Cumbie's knowledge about his involvement with "the company," Flynn's trial testimony about Cumbie's state of mind is too vague and lacking in foundation to constitute substantial evidence that Pacbell had full knowledge of Flynn's fraud in 2002.

Finally, plaintiffs contend that Pacbell gained full knowledge of Flynn's fraud and conflict of interest in April 2003 when attorney Hess, representing Cingular, attended the *TCG v. O'Neal* trial and heard testimony by Flynn indicating he and O'Neal started Solutions together. As we discussed regarding the 2007 summary judgment order, the somewhat muddled testimony in question was not a clear admission by Flynn that he owned an interest in Solutions from its beginning. Thus, the testimony cannot be deemed to have imparted full and actual knowledge of Flynn's fraud and conflict of interest to Cingular.

Like the evidence before the court ruling on the 2007 summary judgment/adjudication motions, the evidence presented at trial does not support a reasonable inference that Pacbell's suspicions and "red flags" concerning Flynn and its agreements with Solutions related to Flynn's ownership interest in OCG and Solutions from their inception. Accordingly, we conclude there was no substantial evidence to support the jury's finding of ratification and waiver under the correct full-knowledge standard – i.e., there was no substantial evidence that TMO and its predecessors had actual and full knowledge of Flynn's interest in Solutions before 2007 and, with that knowledge, manifested an intention to affirm any of the fraudulently-induced contracts

91

by continuing to perform under the terms of the original contract or seeking additional concessions or benefits. As we discuss below, our conclusion that there is insufficient evidence to support findings of ratification and waiver requires entry of judgment against Solutions and in favor of TMO on Solutions's affirmative claims.

II.

*The Trial Court Erred in Instructing the Jury on Waiver and Ratification*

TMO[25] contends the trial court gave the jury erroneous instructions on waiver and ratification. Solutions alleged and presented to the jury different theories of waiver and ratification to overcome TMO's fraud defense to Solutions's affirmative claims, and to bar TMO from recovering on its own claims for rescission and fraud damages. Although TMO proposed multiple instructions and the special verdict form asked multiple questions generally consistent with these various theories, the trial court gave only *one* instruction on waiver that essentially was a hybrid of those proposed by the parties and did not clearly and accurately set forth the standards for any of the relevant theories. The jury found in plaintiffs' favor, concluding that, although the subject agreements had been induced by fraud, TMO either waived or ratified Flynn's fraud, thus allowing Solutions to recover for breach of contract and precluding TMO from rescinding the agreements or recovering any damages.

---

[25] For ease of reference, and unless otherwise noted, throughout this portion of our opinion we will refer to Pacbell and its successors collectively as TMO, even if the events discussed did occurred before T-Mobile's acquisition of Pacbell.

92

We conclude that the trial court's hybrid waiver instruction was erroneous because the jury was likely was confused as to the proper legal standards it was required to apply to the proven facts under each of the waiver and ratification theories raised and reflected in the special verdict form. The instructional error was prejudicial to TMO in light of our conclusion that there is no substantial evidence to support the jury's findings of waiver and ratification.

A.      *Applicable legal principles regarding instructional error*

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp*. (1994) 8 Cal.4th 548, 572 (*Soule*).)  Correspondingly, "[a] civil litigant must propose complete instructions in accordance with his or her theory of the litigation and a trial court is not 'obligated to seek out theories [a party] might have advanced, or to articulate for him that which he has left unspoken.' [Citations.]" (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1686.)  Further, it is settled that a party is not entitled to have the jury instructed in any particular phraseology and "may not complain on the ground that his requested instruction is refused if the court correctly gives the substance of the law applicable to the case. [Citation.]" (*Hyatt v. Sierra Boat Co*. (1978) 79 Cal.App.3d 325, 335 (*Hyatt*).)

Instructional error in a civil case is not ground for reversal unless it is reasonably probable the error prejudicially affected the verdict. (*Soule, supra*, 8 Cal.4th at p. 580.)

93

"A 'reasonable probability' in this context 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' [Citation.]" (*Kinsman v. Unocal Corp*. (2005) 37 Cal.4th 659, 682, italics omitted.) In determining whether instructional error was prejudicial, a reviewing court must evaluate "(1) the state of the evidence, (2) the effect of other instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled." (*Soule*, *supra*, at pp. 580-581, fn. omitted.)

"Instructions by a court should always be clear and simple in order to avoid misleading the jury." (*Hyatt*, *supra*, 79 Cal.App.3d at p. 342.) If a jury instruction challenged on appeal is ambiguous, the reviewing court must consider "whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.) "[I]t is settled that the instructions must be considered in their entirety, and if, as so considered, they state the law of the case fairly and clearly, then they are, as a whole, unobjectionable, even though by selecting isolated passages from single instructions, they may in some respects be amenable to criticism." (*Waller v. Southern Pacific Co.* (1967) 66 Cal.2d 201, 213; *Sprague v. Equifax, Inc*. (1985) 166 Cal.App.3d 1012, 1047-1048.) " 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' [Citation.]" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1112.)

Generally, we are required to presume that the judgment of the trial court is correct and that all reasonable inferences were drawn in the prevailing party's favor.

(*Mock v. Michigan Millers Mutual Insurance Co*. (1992) 4 Cal.App.4th 306, 322.)  In reviewing the jury instructions and the question of their prejudicial impact, however, "we are not required to make such inferences in [the prevailing party's] favor.  To the contrary, we must assume that the jury, had it been given proper instructions, might have drawn different inferences more favorable to the [appellant] and rendered a verdict in its favor on the issues as to which it was misinstructed."  (*Ibid*.)

B.      *The instructions proposed and given*

Consistent with the parties' various theories and respective claims, TMO proposed different instructions relating to the issues of waiver and ratification.  As to the latter, it proffered the following instruction, in relevant part:  "In order to find that [TMO] ratified Flynn's and/or Solutions' fraud in procuring the agreements with Solutions, Solutions and Flynn must prove by clear and convincing evidence:  [¶] 1.  That [TMO] had full knowledge of the essential facts constituting the fraud; and [¶] 2.  That [TMO] engaged in some unequivocal act such as accepting substantial benefits not required by the original contract that indicated its intention to stand on the contract, and to give up or waive any claim for fraud."

With respect to the statute of limitations, TMO asked the trial judge to instruct the jury that it could find the statutory period began running when TMO was on inquiry notice of the facts, meaning "1.  'That [TMO] had knowledge of circumstances that would have made a reasonable person suspicious of the acts and conduct of Michael Flynn and Solutions; and [¶] "1.  That inquiry thereon, if followed, would have led to knowledge of the essential facts giving rise to [TMO's] claims. . . .  When you decide whether a

95

reasonable person would have been suspicious of the acts and conduct of Michael Flynn or Solutions, you must take into account the relationship between [TMO] and Michael Flynn. If you find that Michael Flynn owed a fiduciary obligation to [TMO] then [TMO] had the right to rely on the representations of Michael Flynn and to place trust and confidence in Michael Flynn to disclose all important facts with regard to the transactions with Solutions within his knowledge." TMO also proposed the following instruction: "Even if you conclude that [TMO] had suspicions, or reasonably should have had suspicions of Michael Flynn's alleged conflict of interest, . . . the statute of limitations did not commence at such time if you find that Michael Flynn and/or Solutions hindered [TMO's] discovery of essential facts giving rise to [TMO's] claims by misrepresenting or concealing important facts."

Finally, with respect to its rescission claims, TMO proposed the following instruction:

> "A party may waive a right to cancel a contract if, after full discovery of the facts giving rise to the right to cancel, that party takes steps to affirm the contract. The party's words and acts must indicate that the party has made a definite choice to affirm the contract in spite of knowing all the facts on which he or she might be entitled to cancel the contract. [¶] Waiver does not necessarily follow from the fact that plaintiff continued to make contract payments to defendant after discovering the facts giving rise to plaintiff's claim. You must consider the duration of the payments and the circumstances under which they were made. [¶] Waiver may not occur if the acts of waiver are themselves caused by fraud or other improper conduct. [¶] If you find that Flynn or Solutions owed [TMO] a fiduciary duty, you may not find that [TMO] waived the right to cancel the contract if Michael Flynn or Solutions improperly induced [TMO] to waive the right to cancel the contract against [TMO's] better judgment. Michael Flynn and Solutions must have fully disclosed all important facts before obtaining [TMO's] waiver,

96

and Michael Flynn and Solutions must not have used [TMO's] trust and confidence in them to cause [TMO] to waive [TMO's] rights."

Plaintiff's proposed instruction regarding ratification reads, in relevant part:

"Ratification of a voidable contract is to be determined by consideration of the party's declarations, acts, and/or his conduct. If a party is on notice of circumstances that would put a reasonable man on notice that he has grounds to void a contract, and the party intentionally fails to investigate these grounds, he or it is charged with having ratified the contract. [¶] If a party amends the original contract after it claims to have discovered an alleged fraud, the affirmance of the original contract by amendment is equivalent to a ratification."

Plaintiffs also proffered the following instruction on rescission: "A party waives its right to rescind a fraudulent contract if he acts in [] such a way as to indicate an intent to abide by the contract. Such acts include, but are not limited to: [¶] 1.) accepting payments under the contract; [¶] 2.) making payments under the contract; [¶] 3.) continuing to perform under the contract; [¶] 4.) continuing to accept the benefits under the contract; and/or [¶] 5) entering into new arrangements or engagements concerning the subject matter of the contract to which the fraud applies[.] [¶] If a party is on notice of circumstances that would put a reasonable man on notice that he has grounds to void a contract, and the party intentionally fails to investigate these grounds, he or it is charged with having waived the right to rescind the contract."

Ultimately, the trial court gave the jury only one instruction pertinent to waiver and ratification, entitled "Waiver of Right to Cancel, Effect of Confidential Relationship on Waiver." This instruction essentially was a hybrid of the parties' proposed instructions on waiver of the right to rescind and ratification. The court instructed the jury as follows:

"A party may waive a right to cancel a contract if, after full discovery of the facts giving rise to the right to cancel, that party takes steps to affirm the contract. The party's words and acts must indicate that the party has made a definite choice to affirm the contract in spite of knowing all the facts on which he or she might be entitled to cancel the contract. [¶] Waiver does not necessarily follow from the fact that plaintiff continued to make contract payments to defendant after discovering the facts giving rise to plaintiff's claim. You must consider the duration of the payments and the circumstances under which they were made. [¶] Waiver may not occur if the acts of waiver are themselves caused by fraud or other improper conduct. [¶] A party waives its right to rescind a fraudulent contract if it acts in such a way as to indicate an intent to abide by the contract. If a party is on notice of circumstances that would put a reasonable man on notice that he has grounds to void a contract, and the party intentionally fails to investigate these grounds, he or it is charged with having waived his right to rescind the contract."

The court gave additional instructions on rescission, including an instruction setting forth the general discovery rule as applied to the time limits for filing a rescission claim. The court also provided instructions regarding the statute of limitations on TMO's fraud claims against Solutions and Flynn, and breach of fiduciary duty claim against Flynn, including the statement that even if those claims were filed outside the time set by law, they were "still filed on time, if TMO proves that before that date, it did not discover facts constituting the fraud, and with reasonable diligence could not have discovered those facts." The court gave no separate instruction, however, on ratification, except to remind the jury that both ratification and waiver must be proved by clear and convincing evidence. The trial court also refused to give TMO's separate proposed instruction regarding inquiry notice, as well as its proposed instructions regarding the impact of Flynn's fiduciary duties or his concealment of the fraud on the accrual or waiver of

98

TMO's claims. TMO objected to the court's refusal to give these proposed instructions, as well as to the absence of a separate ratification instruction and the manner in which the court modified the proposed instruction regarding waiver of the right the rescind.[26]

The special verdict form asked the jury to make separate findings on the parties' various claims as follows. In connection with Solutions's affirmative claim under the Caltrans Agreement, the verdict form required the jury to determine whether (1) TMO breached that agreement; (2) Solutions was harmed by that breach; (3) the agreement was procured by fraud; and (4) TMO ratified the agreement. In connection with Solutions's affirmative claims under the SMA for an accounting the verdict form required the jury to determine whether (1) Solutions was entitled to an accounting; (2) the SMA was procured by fraud; and (3) TMO ratified the SMA.

In connection with TMO's affirmative claims for rescission of the SMA, SLA and Caltrans Agreement, the verdict form required the jury to determine whether (1) TMO was entitled to rescind those agreements; (2) TMO waived its right to rescind those agreements; (3) TMO ratified those agreements; and (4) TMO's claims for rescission were barred by the statute of limitations. In connection with TMO's affirmative claims for fraud against Flynn and Solutions, the verdict form required the jury to determine

---

[26] In view of TMO's objections and the instructions it proposed, which we have summarized here, we reject plaintiffs' assertion that TMO invited the instructional error of which it now complains. Contrary to plaintiffs' argument, TMO proposed a specific instruction on ratification that included the necessity of finding some affirmative conduct indicating affirmance of the fraudulent contract. Additionally, although the trial court used some of the language proposed by TMO in its principal "waiver" instruction, there is no support for plaintiffs' contention that TMO "invited" the trial court to use that language in the way it ultimately used it and presented it to the jury.

99

whether (1) Flynn and Solutions made false representations that were reasonably relied on by TMO; (2) reliance was a substantial factor in causing harm to TMO; (3) TMO waived its claim for fraud; (4) TMO ratified the fraud; and (5) the fraud claims were barred by the statute of limitations. Finally, in connection with TMO's affirmative constructive fraud and breach of fiduciary duty claims against Flynn, the jury was directed to determine whether (1) Flynn owed TMO or its predecessors a fiduciary duty; (2) he violated that duty; (3) TMO was harmed by Flynn's "misleading conduct;" (4) TMO waived its claims or ratified Flynn's breach; and (5) TMO's claims were barred by the statute of limitations.

C.      *The court's hybrid instruction on waiver and ratification was
        erroneous and prejudicial*

Once the jury concluded that the subject agreements had been procured by fraud, Solutions could recover on its affirmative claims only if it proved that TMO or its predecessors ratified that fraud.[27] As we discussed above, ratification required proof that (1) TMO had full knowledge of the essential facts of the fraud; and (2) that it engaged in some unequivocal conduct (such as obtaining concessions or additional benefits from Solutions) demonstrating an intention to stand on the contract. (*Oakland Raiders*, *supra*, 144 Cal.App.4th at pp. 1192-1193.), citing *Schmidt v. Mesmer*, *supra*, 116 Cal. at p. 271.)

---

[27]     TMO's fraud defense, if successful, would itself prevent Solutions from enforcing the agreements. No statute of limitation or laches doctrine bars the assertion of fraud purely as a defense to a breach of contract action. (*Styne v. Stevens* (2001) 26 Cal.4th 42, 51 ["Under well-established authority, a defense may be raised at any time, even if the matter alleged would be barred by a statute of limitations if asserted as the basis for affirmative relief."].)

The trial court, however, did not so instruct the jury. Instead, it incorrectly instructed the jury that it could find ratification based not on TMO's' full knowledge of the relevant facts, as the law requires, but merely on evidence that it had inquiry notice of fraud.

Furthermore, the trial court failed to include a specific instruction that, in addition, to full knowledge, there must be evidence that TMO or its predecessors engaged in some conduct that unequivocally demonstrated an intent to stand on the agreements. The key inquiry is whether the defrauded party's actions after discovery of the fraud (e.g., making concessions or granting additional benefits) induced the other party to change its position to its detriment. (*Oakland Raiders*, *supra*, 144 Cal.App.4th at p. 1190.) We recognize that the court's hybrid instruction included the statement that "[t]he party's words and acts must indicate that the party has made a definite choice to affirm the contract in spite of knowing all the facts on which he or she might be entitled to cancel the contract." This statement, standing alone, arguably was sufficient to convey the necessity of finding that TMO engaged in conduct indicating a definitive choice to affirm the contract. (See, e.g., *Hyatt*, *supra*, 79 Cal.App.3d at p. 335 [instruction is sufficient if it "correctly gives the substance of the law"].) The problem, however, is that the court's hybrid instruction also inconsistently and incorrectly informed the jury that it could find ratification based on evidence of inquiry notice, stating: "If a party is on notice of circumstances that would put a reasonable man on notice that he has grounds to void a contract, and the party intentionally fails to investigate these grounds, he or it is charged with having ratified the contract." The instruction, viewed as a whole, did not clearly and separately lay out the requirements for ratification and waiver of the right to rescind.

101

The trial court is obligated to provide "correct, nonargumentative instructions on every theory of the case" advanced by the litigants which are supported by substantial evidence. (*Soule*, *supra*, 8 Cal.4th at p. 572.) In this case, there were multiple theories of liability implicating varying concepts of ratification and waiver, and the special verdict form asked separate questions regarding each one. The trial court, however, provided the jury with only one instruction that was, in essence, an amalgam of these concepts. The instruction was not an accurate statement of the law regarding waiver of the right to rescind because it permitted the jury to find that if TMO merely had notice of facts raising suspicions about Flynn and failed to investigate, it waived its right to rescind, rather than expressly and clearly stating that only a party who continues to perform under and accept the benefits of a contract with *full* knowledge of the essential facts giving rise to the fraud claim may be deemed to have waived the right to rescind. (See *Palmquist*, *supra*, 212 Cal.App.2d at p. 331.) Additionally, the trial court failed to provide a separate, correct instruction regarding the two critical elements of ratification, namely, full knowledge of the fraud, and unequivocal acts demonstrating an intent to abide by the original contract. (*Oakland Raiders*, *supra*, 144 Cal.App.4th at p. 1186.)

As we discussed, the court's instructional error was prejudicial because it allowed the jury to find TMO ratified the fraud and waived the right to rescind the subject contracts despite there being no substantial evidence that TMO's predecessors had the necessary full and actual knowledge of Flynn's fraud to support those findings. The jury's findings of waiver and ratification prejudiced both TMO's defense against Solutions's affirmative claims and its prosecution of its own affirmative claims.

102

Our review of the factors to be considered in determining whether instructional error is prejudicial – other instructions, the arguments of counsel, and the state of the evidence (*Soule, supra*, 8 Cal.4th at p. 580-581) – provides no comfort that the misleading effect of the erroneous instruction in this case was mitigated. The fact that the instruction, which included the "inquiry notice" standard, also used the phrase "in spite of knowing all the facts", did not cure the problem. We agree with TMO that a reasonable jury, having found sufficient evidence to support the more lenient "inquiry" standard, would not then deem it necessary to determine whether the "full knowledge" standard was also met. Indeed, because no separate ratification instruction was provided, the jury had no reason to consider whether the evidence showed TMO had full knowledge of the essential facts of the fraud and whether, with that knowledge, it engaged in some unequivocal act indicating its intent to affirm the agreements.

Plaintiffs contend that any error in failing to give an instruction on ratification was harmless because TMO's counsel emphasized during closing argument the lack of evidence that TMO had full knowledge of Flynn's fraud. However, plaintiffs' counsel, in his closing remarks, argued that both ratification and waiver could be found simply on the basis of evidence that TMO was on notice of the fraud. At best, these contrasting arguments canceled each other out and left the jury with the court's instruction, which was both internally inconsistent and erroneous as to the legal theory it nominally was intended to address – i.e., waiver of the right to rescind.

## III.

*Solutions's Master Site Files Claim Was Untimely Filed*

TMO contends the trial court abused its discretion in allowing Solutions to assert a new claim on the eve of trial for the value of certain master site files that TCG had delivered to TMO. In the third cause of action of its cross-complaint, Solutions alleged that it had "delivered . . . goods and/or services to [TMO]," which TMO refused to pay for, "so as to entitle Solutions to recovery of the agreed-upon value of the unpaid goods and/or services." This cause of action incorporated by reference allegations that TMO had failed to remit fees under the Caltrans Agreement, and that it also owed Solutions management fees under the SMA for various colocation sites involving SpectraSite. In its October 2009 trial brief, however, Solutions added another theory of recovery. In addition to seeking $2.665 million in unpaid rent and management fees, Solutions alleged it was entitled to be paid for the value of master site files that TCG had delivered to TMO after TMO's acquisition of various assets from Cingular. Those files, Solutions asserted, were critical to the operation of the newly acquired network, and as consideration for their delivery to TMO, it was understood that TMO would retain TCG to do site acquisition work for TMO. TMO assigned little or no work to TCG, and never returned the master site files. Solutions claimed the files had a value of $5 million. It is undisputed that Solutions formally propounded this theory of recovery for the first time in its October 2009 trial brief, although the record indicates that TMO had been on notice of this potential claim at least as of January 2007.

104

At trial, Solutions presented evidence that it was owed $1,280,613.35 in unpaid management fees under the SMA. It also argued that the site files were valued at between $8 million and $15 million. The jury ultimately awarded Solutions a total of $1,780,613.35 on its goods and services claim. Based on this verdict, TMO argues the jury awarded Solutions exactly $500,000 for the master site files.[28] TMO raises a number of challenges to this jury award, including that the trial court abused its discretion in permitting Solutions to belatedly amend its goods and services cause of action to include this claim, that Solutions has no standing to assert the claim, and that the applicable statute of limitations bars the claim.

We agree with TMO's contention that the site files claim is untimely. A claim in *quantum meruit* for goods delivered or services rendered, not founded upon a written contract, must be brought within two years.[29] (Code Civ. Proc. § 339 [action upon an "obligation . . . not founded upon an instrument of writing"]; see *Maglica v. Maglica* (1998) 66 Cal.App.4th 442, 453.) Solutions's cause of action accrued upon TMO's alleged breach in failing to provide the consideration agreed upon for the files, which was TMO's assigning site acquisition work to Services (or TCG). (See *Spear v. California*

---

28    Although Solutions's goods and/or services cause of action ostensibly included rents amounts owed under the Caltrans Agreement, the jury separately awarded Solutions $114,400.96 for its claim under the Caltrans Agreement. At trial, Solutions's counsel asked the jury to award "$1,159,865.19 for Solutions' damages under the [SMA] plus its current damages for a total of $1,280,613.35. . . . And that would be part of the . . . goods and services sold and delivered cause of action."

29    Notwithstanding Solutions's assertion that the site-files dispute stems from a written agreement between TMO, Services and TCG , Solutions does not purport to base its goods and services claim on that written document.

*State Automobile Assn*. (1992) 2 Cal.4th 1035, 1040 [statute of limitations does not begin to run until " 'the last element essential to the cause of action' " occurs].)  The parties set no time limits for TMO's completed performance under the alleged May 2005 agreement. However, the evidence shows that Flynn knew by July 2005 that the "work and payment for the files . . . has not been forthcoming."  Thereafter, he attempted to negotiate a resolution by proposing that Services perform alternative site development work for TMO.  Those discussions eventually broke down and Solutions contends this occurred "sometime after September 14, 2005," but no specific date has been identified.

We conclude that the statute of limitations on any goods and services claim related to the master site files began running in July 2005, when it became clear that TMO was not complying with the parties' original understanding.  After that point, the parties began discussing a *different* arrangement, but there is no evidence that Flynn or any of his companies obtained a tolling agreement from TMO regarding any claim it might have for the value of the files it already had delivered.  In these circumstances, the time period for filing any such claim would have expired sometime in July 2007, or two years from Flynn's discovery of TMO's breach.  (Code Civ. Proc. § 339, subd. (1).)  Even if we were to give Solutions the benefit of the doubt and conclude that the statute did not begin running until the parties' subsequent negotiations broke down, the time for filing the site files claim would have expired in late 2007 or early 2008.

Solutions filed its cross-complaint in August 2007.   Even if the statute of limitations applicable to the site files claim had not run by then, the claim is time-barred because Solutions's cross-complaint did not mention the master site files dispute and

106

cannot be deemed to even remotely encompass that claim. The facts underlying the goods and services claim in Solutions's cross-complaint concern solely unpaid rents and management fees allegedly due under the Caltrans Agreement and the SMA. Solutions does not dispute this. It first asserted its master site files claim on the eve of trial in October 2009, well beyond the two-year limitation period even by Solutions's reckoning. Over TMO's objections, the trial court, in its discretion, allowed this claim to go to the jury, effectively permitting Solutions to amend its cross-complaint to conform to the evidence. (See *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378 [the " 'allowance of amendments to conform to the proof rests largely in the discretion of the trial court' "].)

However, Solutions cites no authority for the proposition that the court may allow such an amendment to add a new theory of recovery arising from entirely new facts, when that claim, had it been brought in the normal course at that juncture, would be barred by the statute of limitations. The question arises whether the site files claim related back to the original pleading ─ i.e., Solutions's cross-complaint. " 'The relation-back doctrine requires that the amended complaint must (1) rest on the *same general set of facts*, (2) involve the *same injury*, and (3) refer to the *same instrumentality*, as the original one. [Citations.]' " (*Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235, 244.) Solutions's master site files claim meets none of these criteria. The only common thread between the original cross-complaint and the amended claim allowed at trial is that the latter was characterized as a claim for "goods delivered and/or services rendered." We conclude that Solutions's claim for recovery of the value of the master site files is barred by the statute of limitations and therefore not subject to retrial.

IV.

*Solutions Is Not Entitled to Quantum Meruit Recovery for
Goods and Services Rendered Under the SMA*

Our conclusion that Solutions's master site files claim in time barred requires

reversal of the entire award to Solutions on its goods and services claim.  Apart from its

time-barred master site files claim, the only recovery Solutions sought at trial under its

goods and services claim was $1,280,613.35 in unpaid management fees *under the*

*SMA*.[30]  The jury awarded that precise amount plus $500,000 (attributable to the master

site files claim), for a total of $1,780,613.35 on Solutions's goods and services claim.

The portion of the goods and services award attributable to the SMA is subject to reversal

because it is tainted by the same fraud that renders the SMA void.

The purpose of quantum meruit recovery through a common count for goods and

services provided is to prevent unjust enrichment.[31]  (See *Jogani v. Superior Court*

(2008) 165 Cal.App.4th 901, 906-907, 911; *Hedging Concepts, Inc. v. First Alliance*

*Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1419 ["A quantum meruit or quasi-

contractual recovery rests upon the equitable theory that a contract to pay for services

rendered is implied by law for reasons of justice."]; *Palmer v. Phillips* (1954) 123

---

[30]    Solutions did not sue TMO for breach of the SMA; it sought recovery against
TMO under the SMA solely through its common count (quantum meruit) cause of action
for goods and services delivered.

[31]    Unjust enrichment, which is synonymous with restitution, is a general
principle that underlies various legal doctrines and remedies, including
quantum meruit.  (*McBride v. Boughton* (2004) 123 Cal.App.4th 379, 387-388,
388 fn. 6.)

108

Cal.App.2d 291, 295.) However, a party on whom a benefit is conferred because of another's wrongful conduct is not "unjustly" enriched at the wrongdoer's expense and, therefore, is not required to make restitution. (*Stein v. Simpson* (1951) 37 Cal.2d 79, 86.) To be entitled to restitution, a plaintiff must not only show it conferred a benefit on the defendant but also that it would be unjust for the defendant to retain the benefit. (*California Federal Bank v. Matreyek* (1992) 8 Cal.App.4th 125, 131.) It is not unjust for the innocent party to a fraudulently induced contract to retain benefits conferred by the fraudulent party. (*Ibid.* [" '[A] person is entitled to the benefit of a bargain made by him *without fraud* or duress.' " (Italics added.).]

The jury expressly found that the SMA was procured by fraud. However, in awarding Solutions the damages it sought under the SMA on its goods and services claim, the jury found that the goods and services rendered by Solutions were not "the subject of fraud[.]" The latter finding is irreconcilably inconsistent with the former and presumably is related to the jury's finding that TMO ratified the SMA, which finding, as we discussed, is the result of an erroneous jury instruction and is not supported by substantial evidence. In any event, we conclude the portion of the goods and services award attributable to the SMA must be reversed based on (1) the jury's finding that the SMA was procured by fraud, (2) the trial court's 2007 ruling that the SMA is void for fraud in the inducement, (3) the lack of substantial evidence that TMO waived or ratified the fraud, and (4) the fact that Solutions sought $1,280,613.35 *under the SMA* and the jury awarded that amount (plus $500,000 on Solutions's time-barred site files claim) on Solutions's goods and services cause of action. Solutions is not entitled to recover in

109

quantum meruit for goods and services provided as a result of Flynn's fraud. (*Stein v. Simpson, supra*, 37 Cal.2d at p. 86; *California Federal Bank v. Matreyek, supra*, 8 Cal.App.4th at p. 131.)

V.

*The Trial Court's Order Regarding the Interpleaded Funds*

During the pendency of this action, Solutions filed two cross-complaints in interpleader, alleging that it was in possession of certain funds to which Services, Cingular and TMO all laid claim, and that except for offsets to which it may be entitled, Solutions disavowed any interest in these funds. The interpleaded funds, totaling almost $563,000, represented fees collected by Solutions under the SMA for so-called "Discontinued Activities." These funds were deposited with the court pending further proceedings. After conclusion of the trial, the trial court ordered, over TMO's objection, that the funds be returned to Solutions. On appeal, TMO contends it is entitled to the funds because they represent rents paid by tenants under colocation agreements that would have been paid to TMO but for Services's invalid claim to management fees under the SMA. Solutions did not respond to TMO's contention.

From the outset, Solutions disavowed any interest in these funds except for any offsets to which it might be entitled, and it does not argue here that it was entitled to any. Solutions also admitted during the course of the litigation that the interpleaded funds represented monies it collected for "Discontinued Activities," which were those activities allocated to Services, not Solutions, under the 2002 Flynn/O'Neal Settlement. At trial, Solutions was allowed to prove, and the jury was permitted to consider, only those

110

damages Solutions might have incurred in connection with its "Retained Activities," as the trial court had granted TMO's motion in limine to preclude any attempt by Solutions to seek damages relating to "Discontinued Activities."

On this record, we see no legal justification or factual support for releasing the interpleaded funds to Solutions. The proper course is for the trial court to retain the interpleaded funds pending resolution of TMO's affirmative claims, in particular, its cause of action against Services and Solutions for rescission of the SMA. The trial court will then have to determine whether those funds should be released in whole or part to TMO as restitution or make some other appropriate order as the circumstances warrant. Accordingly, we will reverse and vacate the trial court's order releasing the interpleaded funds to Solutions and order that those funds be redeposited with and held by the trial court pending further proceedings.

## VI.

### *TMO's Other Contentions*

TMO contends that the trial court erred by not including certain prior dispositions and the jury's declaratory relief finding (that the SMA was terminated as of December 1, 2003) in the judgment, and by issuing a judgment that was unclear as to the disposition of Services's claims. These issues are moot in light of our reversal of the judgment on the jury's verdict. After the disposition of TMO's remaining affirmative claims, the trial court must enter a judgment that is final as between TMO and Services, Solutions, and Flynn. TMO may propose a judgment that accurately reflects the disposition of all of the claims between the parties.

111

TMO also contends that court erred in determining that Solutions, Services, and Flynn were prevailing parties entitled to costs and abused its discretion in awarding costs for video exhibits and deposition testimony. This issue is also moot because our reversal of the judgment in favor of Solutions, Services, and Flynn includes reversal of the cost award. The issues of prevailing party status, entitlement to costs, and the amount of costs will have to await further proceedings in the trial court.

VII.

*Effect of Reversal of the Judgment on the Jury Verdict*

Generally, "[t]he effect of an unqualified reversal is to vacate the judgment and leave the case 'at large' for further proceedings, including retrial, as if it had never been tried and no judgment had been entered." (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1237-1238.) However, because as to Solutions's affirmative claims, our reversal of the judgment on the jury's verdict is based on insufficiency of the evidence to support the verdict, we will direct the trial court to enter judgment against Solutions and in favor of TMO on those claims. As the Court of Appeal stated in *McCoy v. Hearst* (1991) 227 Cal.App.3d 1657, "when the plaintiff has had a full and fair opportunity to present his or her case, a reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested. A judgment for the defendant would then be entered, and a new trial permitted only for newly discovered evidence. [Citation.] A new trial under such circumstances is governed by the law of the case doctrine . . . , and the law of the case doctrine applies to an appellate decision on the

112

sufficiency of the evidence. [Citation.] 'The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law.' [Citations.] Consequently, retrying the case on the same evidence is a needless exercise, since the law of the case would compel another decision for the defense." (*McCoy v. Hearst Corp., supra,* 227 Cal.App.3d at pp. 1661-1662.)

In *Cardinal Health 301, Inc. v. Tyco Electronics Corp.* (2008) 169 Cal.App.4th 116, this court similarly held that where "the plaintiff had a 'full and fair opportunity' to present the supporting evidence, and the evidence was insufficient as a matter of law to support a damage award, a reviewing court may strike the award without ordering a retrial." (*Id.* at p. 153; accord, *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 833-834 [judgment for plaintiffs reversed for insufficiency of the evidence with direction that judgment be entered in favor of defendant].) In *Kelly v. Haag* (2006) 145 Cal.App.4th 910, this court reversed a punitive damages award based on insufficiency of the evidence and concluded that remand for a retrial on the issue of punitive damages was not warranted because the plaintiff had a full and fair opportunity to present his case for punitive damages. (*Id.* at pp. 919-920.)

Likewise, in the present case we conclude that a new trial on Solutions's affirmative claims is not warranted because Solutions a full opportunity to present its evidence. Accordingly, we will direct entry of judgment in favor of TMO on those claims.

113

Cingular and its co-appellant related entities CA/NV Tower Holdings, LLC; GSM Facilities, LLC; SBC (i.e., SBC Communications, Inc.); SBC Holdings; and SBC Wireless (collectively, the Cingular entities) contend the trial court erred in failing to determine that they are prevailing parties and thus entitled to costs under Code of Civil Procedure section 1032, subdivision (a)(4). We agree.

Cingular was initially sued by Solutions, Services, Infrastructure Solutions, LLC., TCG, and Flynn (the Flynn entities). The Cingular entities, except SBC, were named as defendants in the Flynn entities' first amended complaint, along with TMO's Pacific Bell predecessors.[32] The Cingular defendants demurred to the first amended complaint and the court sustained the demurrer without leave to amend as to the seventh cause of action for defamation asserted by Services, Flynn, and TCG against Cingular. That ruling eliminated claims by Flynn and TCG against any Cingular entities until Flynn filed his unsuccessful cross-complaint against Cingular.[33]

---

[32] The Pacific Bell entities named in the amended complaints were Pacific Bell Mobile Services and Pacific Bell Wireless, LLC. Plaintiffs alleged those entities were controlled by Cingular and that Cingular was their alter ego.

[33] Although Infrastructure Solutions, LLC is named in the caption of the first amended complaint, it is not identified as a plaintiff in any of the causes of action in the body of the pleading.

Solutions and Services filed a second amended complaint against the Cingular entities, except SBC, and Pacific Bell entities.[34] The court sustained Cingular's demurrer to the second amended complaint without leave to amend as to causes of action for intentional interference with contractual relations (third and fourth causes of action) and intentional interference with prospective economic advantage (fifth and sixth causes of action). The court overruled Cingular's demurrer as to the second cause of action for breach of the SLA, and sustained the demurrer with leave to amend as to the seventh cause of action for violation of the Cartrwright Act.

Solutions and Services filed a third amended complaint against TMO, the Cingular entities (except SBC), and Pacific Bell entities that included a first cause of action by Solutions for breach of the SMA against all defendants, a second cause of action for breach of the SLA by Services against all defendants, and a third cause of action for violation of the Cartwright Act by Services against Cingular. The court sustained TMO's demurrer to the first cause of action with leave to amend and overruled Cingular's demurrer to the third cause of action.

---

[34] Only Solutions and Services asserted causes of action in the second amended complaint.

As noted, only Services asserted causes of action against the defendants named in the fourth amended complaint, who included the Cingular entities (except SBC), Pacbell, and PBMS. Services alleged the following causes of action: a first cause of action against all defendants for breach of the SMA as to Solutions's rights thereunder, which allegedly were assigned to Services; second cause of action against all defendants for breach of the SLA; and third cause of action against Cingular for violation of the Cartwright Act. The trial court (Judge Enright) granted Cingular's and TMO's motions for summary judgment on the entire fourth amended complaint and we are affirming that ruling.[35]

Cingular filed a first amended cross-complaint that included a cause of action against Solutions for breach of the SMA, a cause of action against Services for tortuous interference with the SMA, and causes of action against both Solutions and Services for declaratory relief regarding the SMA, and fraud. As noted, the court granted Solutions and Services's motion for motion for summary adjudication of the second cause of action against Services for tortious interference with contract, based on Cingular's statement that it would not pursue that claim. The court summarily adjudicated Cingular's fraud cause of action in favor of Services for lack of evidence that Services itself made any misrepresentations. Cingular's claims for breach of the SMA and declaratory relief were rendered moot by the court's 2007 order granting summary judgment against Services's

---

[35]  As noted, Cingular's motion was brought by all of the Cingular entities except SBC. (Fn. 8, *ante*.)

on its fourth amended complaint. Before trial, Cingular dismissed its sole remaining cause of action against Solutions and, consequently, was not a party at trial.

Services filed a cross-complaint against Cingular, the three SBC entities (SBC, SBC Holdings, and SBC Wireless), and TMO for fraud, breach of contract (the settlement agreement in the *TCG v. Cingular* action), and contractual indemnity. Cingular and the SBC entities filed a demurrer to Services's cross-complaint. As to the SBC entities, the court sustained the demurrer without leave to amend. As to Cingular, the court sustained the demurrer without leave to amend as to the first and third causes of action and overruled the demurrer as to the second cause of action for breach of the settlement agreement. The court later granted Cingular's motion for summary judgment on the remaining second cause of action, thereby disposing of Services's cross-complaint entirely as to Cingular. Flynn filed a cross-complaint against Cingular asserting a single cause of action for "breach of settlement agreement," and the court granted Cingular's motion for summary judgment on that cross-complaint. Thus, the Flynn entities obtained no relief through any of their complaints or cross-complaints against any of the Cingular entities, and Cingular obtained no relief through its cross-complaints.

By law, "a prevailing party *is entitled as a matter of right* to recover costs in any action or proceeding." (Code of Civ. Proc., § 1032, subd. (b), italics added.) A "prevailing party" is one: (1) "with a net monetary recovery;" (2) "a defendant in whose favor a dismissal is entered;" (3) "a defendant where neither plaintiff nor defendant obtains any relief;" or (4) "a defendant as against those plaintiffs who do not recover any relief against that defendant." (Code Civ. Proc., § 1032, subd. (a)(4).) When cross-

117

complaints are filed, either the cross-complainant or the cross-defendant may be deemed the "prevailing party" depending on the outcome of the main claims and cross-claims involving those parties. (See 7 Witkin, California Procedure (5th ed. 2008) Judgment § 90, p. 627; see also *id.*, § 93, p. 633 (Witkin Procedure); *Schrader v. Neville* (1949) 34 Cal.2d 112, 115 ["Although the defendant did not recover on her cross-complaint, she was the prevailing party in the court below because plaintiff was denied recovery against her."]; accord, *Cussler v. Crusader Entertainment, LLC* (2012) 212 Cal.App.4th 356, 371-372.)

The statute clearly provides that the court *must* award costs to a party that falls within one of the foregoing categories. The court's discretion does not come into play unless the case involves the award of nonmonetary relief, or presents a "situation[] other than those specified." (Code Civ. Proc., § 1032, subd. (a)(4).) "If a party fits into one of the definitions of 'prevailing' . . . that party is entitled as a matter of right to recover costs. [Citation.] In other situations, the prevailing party is determined by the court and the award of costs is discretionary." (Witkin Procedure, *supra*, § 88, p. 626; accord, *Acosta v. SI Corp.* (2005) 129 Cal.App.4th 1370, 1375-1376.) We therefore reject plaintiffs' suggestion that a trial court may use its discretion to determine the "prevailing party" without first determining that costs may not be awarded as a matter of right.

Here, the Cingular entities were prevailing parties under Code of Civil Procedure section 1032, subdivision (a)(4) because each was a defendant or cross-defendant in whose favor a dismissal is entered,[36] a defendant where neither plaintiff nor defendant obtains any relief, or a defendant as against those plaintiffs who do not recover any relief against that defendant. (Code Civ. Proc., § 1032, subd. (a)(4).) Consequently, they are entitled to costs under the statute. (Code Civ. Proc., § 1032, subd. (b).)

Cingular suggests that the court's failure to designate the Cingular entities as prevailing parties is due in part to its decision to omit any reference to them in the final judgment. We note, however, that the trial court has discretion to enter a separate judgment in favor of the Cingular entities before disposition of all issues between TMO and the other parties and entry of a final judgment as to those parties. " 'It is well settled that where . . . there is a judgment resolving *all* issues between a plaintiff and one defendant, then either party may appeal from an adverse judgment, even though the action remains pending between the plaintiff and other defendants.' " (*Oakland Raiders v. National Football League* (2001) 93 Cal.App.4th 572, 578.) "[T]he trial court, in its discretion, may enter judgment in favor of one or more defendants when all issues between those defendants and the plaintiff have been adjudicated, even though the action remains pending against those defendants who have not obtained adjudication of all

---

36    SBC appeared only as a cross-defendant in Services's cross-complaint and successfully demurred to the cross-complaint. Under Code of Civil Procedure section 1032, subdivision (a)(2), the term "defendant" includes a cross-defendant.

issues." (*Ibid.*; Code Civ. Proc., § 579; see also *Hydrotech Systems, Ltd. v. Oasis Waterpark* (1991) 52 Cal.3d 988, 993, fn. 3; *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428, 437; *Millsap v. Federal Express Corp.* (1991) 227 Cal.App.3d 425, 430; *Tinsley v. Palo Alto Unified School Dist.* (1979) 91 Cal.App.3d 871, 880.) Thus, the Cingular entities may prepare and submit their own judgment that reflects the disposition of the various claims between them and plaintiffs, and the trial court has discretion to enter that separate judgment before the final disposition of TMO's affirmative claims against the plaintiffs. In whatever judgment the court ultimately enters to reflect the disposition of the claims between the Cingular entities and the Flynn entities, the court is directed to designate the Cingular entities as prevailing parties entitled to costs under Code of Civil Procedure section 1032.

DISPOSITION

The judgment on the jury verdict is reversed. In the judgment ultimately entered as between TMO and plaintiffs after disposition of TMO's affirmative claims, the court is directed to enter judgment against Solutions and in favor of TMO on Solutions's affirmative claims that were tried to the jury. The court is further directed to enter a judgment reflecting the disposition of the claims between the Cingular entities and the Flynn entities and designating the Cingular entities as prevailing parties entitled to costs under Code of Civil Procedure section 1032. The court's August 21, 2007 order granting TMO's and Cingular's motions for summary judgment on the plaintiffs' fourth amended complaint is affirmed. The trial court's January 21, 2009 order sustaining

defendants/cross-defendants' demurrer to the first cause of action for fraud in Services's cross-complaint without leave to amend is affirmed. The trial court's August 21, 2009 order granting Cingular's motion for summary judgment on Flynn's cross-complaint is affirmed. The trial court's order directing that the interpleaded funds be returned to Solutions is reversed and vacated. The Cingular entities and TMO are awarded their costs on appeal.

BENKE, Acting P. J.

WE CONCUR:

HUFFMAN, J.

McINTYRE, J.